[No. 23525. Department Two. March 22, 1932.]

Fox West Coast Theatres, Inc., *et al., Respondents,*
v. Union Indemnity Company, *Appellant.*[1]

*Eggerman & Rosling,* for appellant.
*Venables, Graham & Howe,* for respondents.

Millard, J.—This action was brought to recover
upon a policy of insurance providing coverage for loss
of property in the Coliseum theater, in Seattle, oc-
casioned by robbery. The cause was tried to the court,
which found that the manager and assistant manager
of the theater were the custodians of the property at
the time it was stolen, "having the care and custody
thereof," and that the theater "was open for business
at the time of said robbery." From the judgment
entered in favor of the plaintiffs, the defendant ap-
pealed.

The facts are as follows: The Coliseum theater in
Seattle was operated by respondents. A policy of in-

[1]Reported in 9 P. (2d) 78.

surance issued by the appellant to the respondents provided indemnity for loss of or damage to property in the theater occasioned by robbery within the theater between the hours of seven a. m. and midnight. The pertinent provision reads as follows:

"Insuring Clause B. For all loss of or damage to property as hereinafter defined, including the furniture, fixtures and other property in the premises (except plate glass, and lettering or ornamentation thereon), occasioned by ROBBERY OR ATTEMPT THEREAT committed during the hours beginning at 7 o'clock a. m. and ending at 12 o'clock midnight (within the Policy Period) within the Assured's premises. . . ."

Dave Himelhoch was the manager, and Nick Schmitz was the assistant manager, of the theater. At six o'clock the morning of April 7, 1930, a knock upon the door of his home aroused Himelhoch from slumber. Upon opening the door he was informed by one of two men standing near the doorway that the janitor at the theater "is badly hurt." The informant's request to enter the house and use the telephone was granted. Upon entering, the visitor displayed a pistol and stated that it was his and his companion's intention to compel Himelhoch to go to the theater and open the safe. Only three persons knew the combination of the safe: Himelhoch, Schmitz and one of respondent's officials in California. Himelhoch told the caller that he did not know the combination of the safe. Nevertheless, he was required to don his clothing and drive his automobile, with one of the robbers riding in the seat with him, down town. The other robber remained in Himelhoch's home and by threats of violence dissuaded Mrs. Himelhoch and other members of the family from making any outcry.

Himelhoch was compelled by his captor to drive about town for thirty or forty minutes. Apparently

convinced that Himelhoch did not know how to open the safe, the robber and Himelhoch returned to the home of the latter. This robber then withdrew from the Himelhoch home, being absent therefrom fifteen or twenty minutes, during which time he telephoned to the home of Nick Schmitz, assistant manager of the theater, and informed him, ''You had better come down to the Coliseum theater. I understand you have all the keys to the theater and there has been a door broken, and we need you.'' Schmitz replied, ''All right,'' but returned to his bed, thinking some practical joker was functioning. Schmitz's usual time of arrival at the theater was from nine-thirty to ten o'clock a. m. Himelhoch and his family were guarded by the second robber in the former's home during this fifteen or twenty minutes.

The telephoning robber returned to the home of Himelhoch, who was compelled to accompany the former to the theater, where they arrived in Himelhoch's automobile shortly after eight a. m. The second robber remained on guard at the Himelhoch home. When Himelhoch and his abductor arrived at the theater, the night watchman was departing therefrom, having completed his tour of duty. As an officer, so the robber told the watchman, he was making an investigation with reference to a robbery which occurred the previous night in the vicinity of the theater. This excited the curiosity of the night watchman, who seated himself not far from the theater office to obtain such information on the subject of the robbery as might be forthcoming.

About this time, a lady who was employed as a secretary or clerk in the theater office, arrived. The robber compelled Himelhoch and the lady to remain seated in the inner office while awaiting the arrival of

Schmitz, to whom the robber again telephoned the request that Schmitz come to the theater. Confirmatory of the summons, Himelhoch by telephone said to Schmitz, "You had better come down; we need you."

Schmitz arrived at the theater about nine a. m. The door man and the assistant maintenance employee were then on duty. While the latter two employees were required to report for duty at nine a. m., they were not habitually punctual; they sometimes arrived earlier than required and sometimes they were tardy. Upon arriving at the theater, Schmitz briefly conversed with the assistant property man about certain work to be performed that day, and then went into the office, in which were Himelhoch, his captor and the lady secretary.

Schmitz did not believe, when directed to open the safe, that a robbery was to be committed. The robber fired once near Schmitz to convince him that the purpose of the visit was to obtain the money in the safe. Thus intimidated, Schmitz opened the safe, from which the robber took approximately sixteen hundred dollars. The robber, using Himelhoch's automobile, rejoined his confederate at Himelhoch's home, and the two then disappeared.

Appellant insists that the custodians (respondents' manager and assistant manager) did not have the actual care and custody of the property involved, as the loss occurred at a time when the manager and assistant manager were present under duress in advance of their business hours, without the knowledge and consent of the Assured. Therefore, contends appellant, it was not obligated under the insurance contract to indemnify respondents for the loss.

Under the "Special Agreements" of the policy, robbery is limited to a felonious and forcible taking of property:

"(a) By violence inflicted upon the custodian or custodians in the actual care and custody of the property at the time; or

"(b) By putting such custodian or custodians in fear of violence; or

"(c) By an overt felonious act committed in the presence of such custodian or custodians and of which they were actually cognizant at the time."

The policy further provides that "custodian" is limited to the Assured's messenger, paymaster, manager, cashier, clerk or sales person, and while so acting to have the actual care and custody of the property covered under the policy. Paragraph 6 of the policy exempts the insurer from liability for any loss

" . . . occurring from within the premises when not actually open for the transaction of business, if at such time an employee of the Assured is therein without the knowledge and consent of the Assured."

We understand appellant to argue that it is not liable under the indemnity contract if the premises were not "actually open for the transaction of business" at the time of the robbery, if any employee of the respondents were on the premises without the knowledge and consent of the respondents; that, if the premises were at the time of the robbery "actually open for the transaction of business," the appellant is not required under the policy to indemnify the respondents for their loss unless, immediately preceding the robbery, the custodians of the property involved were in the office in the exercise of their official duties; that, by being deprived of their freedom and power to exercise such duties prior to reporting at their office, into which they were brought under duress and by a subterfuge, the manager and assistant manager were not at the time of the robbery custodians in the actual care and custody of the property.

█ The premises were actually open for the transaction of business at the time of the felonious and forcible taking of the property, which was at the time in the actual care and custody of respondents' two custodians.

The robbery occurred at five minutes past nine o'clock the morning of April 7, 1930. True, the theater did not open for the exhibition of pictures until eleven-thirty each morning. The office, however, was opened each morning at nine o'clock for the transaction of business. The night janitor had completed his duties when Himelhoch was brought to the theater shortly past eight a. m. The lady secretary employed in the office arrived shortly after Himelhoch appeared, and she was imprisoned with him in the inner office to await the arrival of Schmitz. Schmitz appeared about nine a. m. Two other employees were then on duty. It is not material whether Schmitz and Himelhoch were in the habit of reporting at nine-thirty or ten a. m. each day. Their subordinates were present. It is not material to the continuous transaction of business of an office that the manager or other head be present each minute of the eight or more working hours of the day.

The phrase in the policy ''open for the transaction of business'' means not, as appellant contends, only the exhibition of pictures in the theater. The proper management of a theater requires the discharge of business other than that of mere admitting of the public to the exhibition of the pictures. The office was open for the making of deliveries and the transaction of any other business essential to the operation of the respondents' theater. Necessary to the respondents' operation of the theater were the keeping of the accounts and other administrative duties. The lady secretary was present in the office to perform the office

work at the time of the robbery. From the time the office was opened at nine o'clock each morning, the public had access thereto.

Himelhoch and Schmitz, manager and assistant manager, respectively, were custodians as defined by the insurance policy. The receipts of the theater were each evening brought to the office and placed in their care and custody. They were charged with the duty of placing that money in the safe, the combination to which was known by three persons (Himelhoch, Schmitz and one of respondents' officials in Los Angeles), and keeping it there until the bank opened the next morning. It was the duty of Himelhoch or, in his absence the duty of Schmitz, to deposit cash in the bank each morning. The money was in the care of the manager and assistant manager. That money was in the custody of these two men for safekeeping.

"Goods which are in a person's 'care', are in his custody, in his charge, in his hands or under his control for safekeeping, preservation, security." Ballentine's Law Dictionary (1930 ed.), p. 189.

As the funds were locked within the safe, to which only Himelhoch and Schmitz had the combination, the two men had control of the funds. That control was retained by them as long as they refused to divulge to the robbers the combination or for the period they refused to open the safe. Himelhoch's pretended lack of knowledge of the combination delayed the robbers in withdrawing the money from the safe until a few minutes past nine a. m., approximately three hours subsequent to the time the robber assumed control of Himelhoch's physical movements. By his refusal to aid the robbers he retained control, custody of the funds which were in his and Schmitz's care. Until the safe was opened by Schmitz because of the threats of the robber, and the funds were taken from the safe,

those funds were in the care, custody and control of the two custodians. The two custodians had the actual care and custody of the property until a few minutes after nine a. m.

It is true that, prior to entering their office to exercise their official duties, the two custodians were deprived by the robbers of their freedom and power to exercise such duties. The result would have been the same had they been on duty in the office prior to the entry of the robber, and thereafter deprived of their freedom and compelled to open the safe to the robber. Nor would any different rule apply if the robber had gained access to the office before the custodians entered, and upon their entrance to commence their day's work they were then deprived of their freedom and forced to open the safe. In each case, the robbery would be within the premises and inflicted by violence or fear thereof upon the custodians having actual care and custody of the property at the time.

The judgment should be, and it is, affirmed.

TOLMAN, C. J., MAIN, HOLCOMB, and BEALS, JJ., concur.