FIDELITY–PHENIX FIRE INS. CO. OF
NEW YORK v. PILOT FREIGHT
CARRIERS, Inc.

No. 6338.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 15, 1951.

Decided Jan. 7, 1952.

C. R. Wharton and Richard L. Wharton, Greensboro, N. C. (Gregory S. Rivkins, New York City, Wharton, Poteat & Wharton, Greensboro, N. C., and Hill, Rivkins & Middleton, New York City, on the brief), for appellant.

B. S. Womble, Winston-Salem, N. C., and C. T. Boyd, Greensboro, N. C. (W. M. York, Greensboro, N. C., C. W. Womble, Winston-Salem, N. C., York & Boyd, Greensboro, N. C., and Womble, Carlyle, Martin & Sandridge, Winston-Salem, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment in the amount of $49,750 in favor of Pilot Freight Carriers, Inc., the Plaintiff in the District Court, in a suit against Fidelity-Phenix Fire Insurance Company of New York. The claim was based on damages caused by the theft of 630 cases of cigarettes belonging to R. J. Reynolds Tobacco Company and transmitted by the plaintiff, as a common carrier. The suit is on a cargo insurance policy which covered the legal liability of the assured carrier for the amount (not exceeding $49,750) that it should be forced to pay for loss on shipments of goods from certain perils, including theft. The carrier has paid the Reynolds loss.

The question presented is whether the loss is covered by the policy which, with respect to theft, contains the following provisions:

"1. In consideration of the rate at which this policy is written, it is a condition precedent to the liability of the Insurer hereunder and to the effectiveness of this policy as respects theft coverage for vehicles, that trucks and trailers owned, hired or used by the Assured will be equipped with a Senior Babaco Alarm including Parker when more than 50% of the load consists of manufactured tobacco products, textiles, alcoholic beverages or any or all combined; that such Babaco Alarm System and Parker will be maintained in working order at all times, inspected and approved once each month by the Babaco Alarm Systems, Inc. and proper inspection certificates issued.

"2. It is also a condition precedent to the liability of the insurer hereunder and to the effectiveness of this Policy as respects theft coverage for vehicles, that all the Babaco equipment protecting the cargo compartment of each vehicle equipped as aforesaid shall be in the 'on' position while aforementioned merchandise is contained in said compartment, except with respect to any trailer which is actually being loaded, and/or unloaded and that while any trailer is being loaded and/or unloaded, at least one man shall be in actual attendance on the cargo compartment.

"3. It is further warranted by the Assured that the Babaco Alarm System on the cargo compartment of each and every truck or trailer transporting a load 50% or more of which consists of manufactured tobacco products, textiles, alcoholic beverages or any or all combined and covered hereunder shall be sealed by the Terminal Dispatcher or agents as designated below immediately after loading is completed and prior to the trailers leaving the loading terminal or shipping point, and unsealed by only the Terminal Dispatcher at Assured's regular terminals or by agents as designated below upon the arrival of said vehicles —the Babaco Alarm System to be sealed by means of the 'Sealed Load' key provided by the Babaco Alarm Systems, Inc.

\* \* \* \* \* \*

"5. It is further warranted by the Assured that the Babaco Alarm System on the Cargo compartment of each trailer and the 'Parker' device on each trailer will be in the 'on' position when such vehicles are parked unattended, when loaded with commodities and in amounts stated above.

"6. The assured agrees, by acceptance of this policy, that the foregoing conditions precedent relate to matters material to the

accceptance of the risk by the Insurer. Failure of the insured to comply with any of the foregoing conditions precedent in any instance shall render policy null and void as respects theft coverage for vehicles."

The insured carrier is a North Carolina corporation with its principal office at Winston-Salem. The vehicle used by it in transporting the stolen freight was an enclosed trailer, approximately 30 to 32 feet in length, drawn by a separate motor tractor. Freight was loaded into the trailer through rear doors which could be closed and sealed. The trailer was equipped with the theft protection device, described in the policy and known as the Senior Babaco Alarm, consisting of two parts, the "Sealed Load" alarm and the "Parker" alarm. Both parts were controlled by a steel alarm box, 30 inches long, 10 inches wide and 12 inches deep, mounted beneath the body of the trailer on the right side, about midway between the front and the rear end. The box contained batteries and a loud siren alarm, and was operated by means of two keyhole switches, each having an "on" and an "off" position, one controlling the "Sealed Load" alarm, and the other the "Parker" alarm.

Ordinarily in such a device the "Sealed Load" is applied immediately after a cargo is loaded on the trailer and the trailer doors sealed. The "Sealed Load" alarm is then placed in the "on" position, and it becomes impossible to open the rear doors without sounding the siren alarm. Keys to the "Sealed Load" alarm are kept only at the motor carrier's terminal points and were not furnished to drivers en route. Hence the "Sealed Load" alarm ordinarily remains "on" from the point of shipment to the point of destination.

The other half of the Babaco device, the "Parker" alarm is designed to prevent the unauthorized movement of the trailer. When the "Parker" switch is "on", it is impossible to move the vehicle without sounding the siren alarm. Since the insurance policy required that the "Parker" alarm be kept in the "on" position whenever an insured vehicle was left parked unattended, the drivers should have been supplied with a key; but, for some unexplained reason, the carrier did not furnish keys to its drivers.

On the morning of March 3, 1949, carrier's trailer No. 81 was inspected at its Winston-Salem terminal and the Babaco "Sealed Load" device was found to be defective. It was taken to the Babaco service agency in town where it was discovered that the wires had been cut. They were replaced and the system was tested and found to be operating properly. The trailer was then taken to the R. J. Reynolds Tobacco factory, loaded with 630 cases of Camel Cigarettes, the doors were closed and sealed, and the "Sealed Load" alarm switch was turned to the "on" position. A two-man crew drove the trailer and tractor from Winston-Salem to the carrier's terminal in Hoboken, New Jersey, arriving at about seven o'clock the following morning. Neither member of the crew had a key for the "Parker" device, and the testimony indicates that the carrier had "somehow or other along the line * * * dropped off the 'Parker' key business." The members of the truck crew testified, however, that the tractor-trailer unit was never parked unattended from North Carolina to Hoboken, New Jersey. The only stops were made at the carrier's checking stations where an employee would watch the unit while the drivers ate.

The drivers turned the tractor-trailer and the bills of lading over to the watchman at the Hoboken terminal, where, about an hour later, a local driver, Salvatore Sinno, was assigned to drive the vehicle to the Lakawanna Warehouse of the R. J. Reynolds Company in Jersey City, about a mile and a half away. Sinno drove the vehicle to a point 150 yards from the Lakawanna Warehouse and parked it on the right side of the street. He then crossed the street to a cafe, had a cup of coffee and some cake, then walked to the warehouse, got a lot number, and returned to the tractor-trailer. Since he was not supplied with a key, the "Parker" device remained in the "off" position during his 15 minute absence. Upon his return he opened the left door of the tractor and started to climb in when he saw a man with a pistol in the cab on the right hand side of the seat.

The man ordered Sinno to get in and "keep his mouth shut." Another man jumped on the left side of the running board and Sinno was directed to drive the vehicle around the corner, approximately two and a half blocks, where he was ordered to stop. He was forced to get out of the cab and to get into the rear of a waiting automobile on his hands and knees. Several hours later he was released about 14 miles north of the Hoboken terminal and reported the robbery by telephone to the terminal. The vehicle was found empty that evening in New York City. The "Sealed Load" switch was then in the "off" position.

There was some conflict in the evidence as to whether the "Sealed Load" alarm to the cargo compartment was in the "on" position at the time of the theft; but the jury having resolved this conflict in the plaintiff's favor, we are not concerned with it on this appeal. It is conceded, however, that the "Parker" device was not in the "on" position when Sinno parked the vehicle and left it unattended on the street, and the question therefore arises as to whether, under the circumstances related, this failure on the part of the insured to comply with the warranty contained in the fifth paragraph of the Babaco warranty bars recovery for the loss. The District Judge had no doubt that failure on the part of the insured to comply with this provision would avoid the policy; but he was of the opinion that although the device was not "on", there was substantial evidence that the vehicle was not unattended, when the loss occurred, and hence the jury's finding on the second issue required a judgment for the insured. 98 F.Supp. 329.

■■ We think that the conclusion on the first point was correct, but that the conclusion on the second point cannot be sustained. It is well established in North Carolina decisions, which control us in this case, that if a policy of insurance contains a stipulation material to the risk, on breach of which the policy is to be avoided, there can be no recovery if the stipulation is not fulfilled; Alspaugh v. British-American Ins. Co., 121 N.C. 290, 28 S.E. 415; Roper Lumber Co. v. National Fire Insurance Co., 161 N.C. 151, 76 S.E. 869;

Greene v. Aetna Ins. Co., 196 N.C. 335, 145 S.E. 616. See also Graham v. American Eagle Fire Ins. Co., 4 Cir., 182 F.2d 500.

The insured, however, contends that paragraph 5 of the Babaco warranty does not create a condition precedent to liability but only a warranty and that mere breach of the warranty does not bar recovery for the loss. It is pointed out that the term "condition precedent" is used in paragraph 1 of the Babaco warranty with reference to the equipment of the vehicle with a Babaco alarm including "Parker", and with reference to maintaining the equipment in good order at all times, and that the same term is used in paragraph 2 of the warranty with reference to placing all the Babaco equipment protecting the cargo compartment of the vehicle in the "on" position while merchandise is contained in the compartment; but that in paragraph 5 the words "condition precedent" are not used, and it is merely "warranted" by the assured that the Babaco alarm system on the cargo compartment and the "Parker" device on each trailer will be in the "on" position when the vehicle is parked unattended when loaded with commodities. It is also emphasized that in paragraph 6 the assured agrees that the foregoing "conditions precedent" relate to matters material to the risk and failure to comply with any of the foregoing "conditions precedent" in any instance shall render the policy null and void, but that no such agreement is specifically made with reference to the foregoing warranties. Hence it is contended that the failure to abide by a warranty is immaterial, unless the failure has a causal connection with the loss.

We do not agree with this construction of the Babaco warranty contained in the policy. Laying aside for the moment the meaning ordinarily given to the terms "condition precedent" and "warranty", it seems quite unreasonable to infer that the Insurance Company, having carefully prescribed the installation of protective equipment as a condition of coverage of loss from theft, should simultaneously impair this security by failing to provide a like requirement for the use of the equipment. The inconsistency involved in such a con-

struction is heightened by the use of the term "condition precedent" in paragraph 2 of the warranty wherein it is provided that the Babaco equipment protecting the cargo compartment must be in the "on" position while the compartment contains merchandise; and the use of the term "warranty" in paragraph 5, where it is provided that the alarm system on the cargo compartment shall be in the "on" position when the compartment is loaded with merchandise and the vehicle is parked unattended. No reasonable explanation can be assigned for avoiding the insurance in one situation and not in the other. Manifestly the terms "condition precedent" and "warranty" were intended to have the same meaning and effect. This conclusion is borne out by the name "Babaco Warranty" which is used as a caption for the six paragraphs which constitute the rider; and by the use of the phrase "it is further warranted" in the paragraphs succeeding those in which the term "condition precedent" is employed.

That the insurance was granted on the condition precedent that both safety devices be used is manifest from the requirement in the first paragraph of the warranty that they be "maintained in working condition at all times"; but when the insured abandoned the use of the parking device by failing to furnish the drivers with keys, it is evident that the purpose of the contract was frustrated as effectually as if the device had been removed from the vehicle.

Furthermore, the term "warranty" in an insurance contract ordinarily imports an assurance on the part of the policy holder that a certain situation exists or will continue, which diminishes the likelihood that the event insured against will not occur; and hence "warranty" and "condition precedent" are often used interchangeably to create a condition of the insured's promise. See Patterson, Cases on Insurance, p. 452; Couch on Insurance, Sec. 870; 29 Am.Jur., Insurance, Sections 529, 530; 59 A.L.R. 611.

Even if the terms "condition precedent" or "warranty" are not used in the policy, an unambiguous provision so expressed as to indicate that the liability is dependent upon a certain condition, will be enforced in North Carolina, for as said in McDowell Motor Co. v. New York Underwriters Ins. Co., 233 N.C. 251, 63 S.E.2d 538, 540, "the rule is equally well settled that an insurance policy is only a contract and subject to the same rules of interpretation applicable to written contracts generally, and the intention of the parties as gathered from the language used in the policy is the polar star that must guide the courts in the interpretation of such instruments."[1]

The insured makes the additional contention that even though the driver left the vehicle unattended for a period during which the insurance became inoperative, the policy was revived when the driver returned and resumed attendance, and since this happened before the theft was complete, the loss was covered by the policy. This construction rests upon the rule which prevails in North Carolina and elsewhere that the violation of a continuing condition which works the forfeiture of a policy of insurance merely suspends the insurance during the violation, and if it is discontinued during the life of the policy and does not exist at the time of the loss, the policy revives and the insurer is liable. Cottingham v. Maryland Motor Car Ins. Co., 168 N.C. 259, 84 S.E. 274, L.R.A. 1915D, 344; Crowell v. Maryland Motor Car Ins. Co., 169 N.C. 35, 85 S.E. 37.

To obtain the benefit of this rule in the pending case the insured must show that the evidence justified the finding of the jury that the driver was in attendance when the theft occurred. On this point the judge instructed the jury that for attendance upon a motor vehicle something more is required than the mere physical presence of the operator; he must be in a position free to perform his duty; and one wholly deprived of liberty of action cannot be

1. See also Coleman Furniture Corp. v. Home Ins. Co., 4 Cir., 67 F.2d 347; Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, 52 S.Ct. 230, 76 L.Ed. 416; Graham v. American Eagle Fire Ins. Co., 4 Cir., 182 F.2d 500.

said to be in attendance within the meaning of the policy in suit. Up to this point in the charge of the court the matter was left to the determination of the jury; but the judge went on to say that if in the course of his duty the truck driver came back to the truck and started to get into it, with the intention of driving it into his employer's warehouse, and if he was then acting voluntarily in order to carry out his employer's orders, then he was in attendance upon the truck within the meaning of the policy. Since the facts in regard to the driver's leaving and returning to the truck were not controverted, these instructions amounted in effect to a direction to find the issue for the plaintiff. In our opinion the undisputed facts preclude such action. The meaning of attendance upon the tractor trailer was correctly stated to involve not merely physical presence but freedom to perform the duties of an attendant. In this instance, however, it was proved that the driver was deprived of all freedom of action the moment he entered the cab of the trailer since the armed bandit had already taken forcible possession of the vehicle. In our opinion there should have been a directed verdict for the defendant on this point.[2]

Furthermore, even if it be assumed that the driver was in attendance before the crime was complete, the position of the plaintiff cannot be sustained. It rests upon the theory that the breach of condition was repaired, and that during its existence no loss was suffered, and consequently the parties were restored to the position they occupied before the breach occurred. We are told that this statement fits the facts of the case because the crime of larceny is not committed by the mere seizure or taking control of an article, but there must also be an asportation or carrying away; and since the truck, although taken, was not moved until after the driver returned, the larceny occurred while the truck was attended within the meaning of the policy.

The law of larceny in North Carolina is correctly stated in State v. Cameron, 223 N.C. 449, 27 S.E.2d 81; and it would be pertinent to this discussion, if it were necessary to determine the point of time at which the theft had been so completely perpetrated as to warrant an indictment for larceny; but the question for our determination is whether the facts justify the restoration to full vigor of a policy which had been suspended during a breach of the contract. Manifestly such a revival should not and cannot take place unless nothing has happened in the meanwhile to increase the insurer's risk of loss. Since the property had passed out of the control of the agent of the company during the interval in which he left the vehicle unattended, it would be nearer the truth to say that the loss had become well nigh an assured fact before the driver's return, and consequently no revival of the policy took place.[3]

The situation with which we have to deal resembles that in Henjes v. Aetna Ins. Co., 2 Cir., 132 F.2d 715, where an insured tug violated a provision of the policy in towing more than one barge, and while so doing received certain injuries which led to the loss after she had cut loose from the tow. Although the policy specifically provided for suspension of the insurance only during the breach of the condition, the court held that the insurance company was discharged from liability. In part the court said, 132 F.2d at page 720: "* * * When a loss is claimed after the insurance has been suspended by a breach of the warranty the insured must, of course, prove that it was sustained while the policy was in force and this required proof in this instance that the sinking, though occurring

2. We find nothing in Birgbauer v. Aetna Casualty & Surety Co., 251 Mich. 614, 232 N.W. 403, and London v. Maryland Cas. Co., 210 Minn. 581, 299 N.W. 193, on which the plaintiff relies, at variance with these conclusions.

3. We have considered the cases cited by the plaintiff in this respect but none of them seem to us to be in conflict with this conclusion. See Saks v. St. Paul Mercury Indemnity Co., 308 Mich. 719, 14 N.W.2d 547; Cartier Drug Co. v. Maryland Casualty Co., 181 Wash. 146, 42 P.2d 37; Fox West Coast Theatres v. Union Indemnity Co., 167 Wash. 319, 9 P.2d 78; Bank of Conception v. American Bonding Co., 230 Mo.App. 54, 89 S. W.2d 554.

after the policy reattached, was not caused by injuries the vessel received while the insurance was suspended. The insured may not by breach of warranty increase the risk and put that added burden upon the insurer." [4]

In Crowell v. Maryland Motor Car Insurance Co., 169 N.C. 35, 85 S.E. 37, the North Carolina Court, in following the rule of Cottingham v. Maryland Motor Car Ins. Co., 168 N.C. 259, 84 S.E. 274, L.R.A. 1915D, 344, stressed the fact that the revival of an insurance policy which has been suspended for breach of a condition in the policy, does not take place if there is an increase of the risk.

■■ It is said that the breach of warranty in the pending case had no causal connection with the loss. The reason given is that even if the Parker device had been placed in the "on" position when the driver left the vehicle, he would have turned it off before he entered the cab of the truck to drive to the warehouse. There may be room for a difference of opinion on this point, since it seems clear that the thieves had the stolen vehicle under close observation and were probably well aware of the driver's actions throughout. But it is not necessary to pursue this inquiry because under the law of North Carolina no causal connection need be shown between the breach and the loss if the loss occurs while the breach continues. Ritchie v. Travelers' Protective Ass'n, 203 N.C. 721, 166 S. E. 893. See also, Flannagan v. Provident Life & Accident Co., 4 Cir., 22 F.2d 136; Home Ins. Co. v. Ciconett, 6 Cir., 179 F.2d 892.

The decision in Smith v. Fire Ins. Co., 175 N.C. 314, is not at variance with this rule for in that case the condition of the fire insurance policy that a space of 200 feet be maintained between the insured property and any woodworking establishment was not actually violated, the court being of the opinion that the terms of the policy did not cover a woodworking estab-

lishment within the prohibited area which was not in operation.

The judgment of the District Court is reversed and the case is remanded with directions to grant defendant's motion to set aside the verdict and enter judgment n. o. v. for the defendant.

Reversed and remanded.

---

4. See also, Milkes v. United States Fidelity & Guaranty Co., 257 Ill.App. 65; Automobile Ins. Co. of Hartford v. Fixler Bros., 6 Cir., 117 F.2d 979; H. & S. Pogue Co. v. Fidelity & Casualty Co., 6 Cir., 299 F. 243; Athens Mutual Ins. Co. v. Toney, 1 Ga.App. 492, 57 S.E. 1013.