**CANAL INSURANCE COMPANY,**
Appellant,

v.

James C. **DOUGHERTY,** d/b/a East
Coast Hatching Egg Express,
Appellee.

No. 16230.

United States Court of Appeals
Fifth Circuit.

Aug. 13, 1957.

Blackwell, Walker, & Gray, W. L. Blackwell, Jr., W. L. Gray, Jr., Miami, Fla., for appellant.

Richard F. Ralph, Walter Humkey, Miami, Fla., Fowler, White, Gillen Yancey & Humkey, Miami, Fla., of counsel, for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

On this appeal from a jury trial judgment awarding recovery under a Motor Truck Cargo Liability Policy, the Insurer, by defenses, partial or complete, contends that the substitution of vehicles was not reported as required and that, in any event, ultimate payment of a prior claim long after the loss in suit, retrospectively reduced the amount of insurance since application for reinstatement was not made immediately after the first loss.

The Assured, operating under the indigenous name of East Coast Hatching Egg Express, was engaged in the regular activity of an exempt, 49 U.S.C.A. § 303 (b) (6); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910; East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917, common or contract interstate carrier of hatching eggs southbound from New England to the Georgia-Florida poultry area. To avoid a dead haul northbound, Egg Express frequently transported fruits and vegetables, likewise exempt. While exempt from regulation by the Interstate Commerce Commission, Egg Express had the traditional and extensive liabilities of a carrier to shippers whose eggs, southbound, and produce, northbound, it undertook to transport. To insure this legal liability [1] as a carrier for loss of or damage to shippers' goods, the Insurer issued for a flat single premium its term policy for the period November 14, 1952 to November 14, 1953, in the face amount, after two additions, of $10,000.

Since the subject of the insurance was the legal liability of the Assured as carrier-bailee, and not the vehicles themselves by which transportation was effected, the policy gave the Assured the unlimited privilege of substituting [2] vehicles for the scheduled ones provided only that report of the substitution be made within 72 hours.

The policy also provided that liability for any loss would be reduced [3] by the

---

1. The principal insuring clause provided: "This policy covers the legal liability of the Assured as a carrier and/or bailee and/or warehouseman under tariff and/or bill of lading and/or shipping receipt issued by the Assured, for loss or damage caused directly by perils hereinafter enumerated on shipments of lawful goods and/or merchandise received for transportation consisting principally of *eggs* but only while loaded for shipment on and/or in transit in or on the following described motor truck(s) and trailer(s) operated by the Assured * * *." [This was followed immediately by a scheduled listing of tractors and trailers by identifying serial numbers.] * * *

"This policy covers the Assured's liability from the time the merchandise leaves the premises, factory, store or warehouse, in the custody of the Assured, at point of shipment on board the herein specified truck(s) or trailer(s) in due course of transit, until unloaded at destination * * *."

2. "Privilege is hereby granted the Assured to substitute at any time during the currency of this policy, other trucks or trailers than those described herein, provided such substituted trucks or trailers are operated by the Assured. The Assured hereby warrants to report within seventy-two (72) hours to this Company, in writing, all such substitutions and to pay additional premium, if required."

Obviously, depending on the age, characteristic, and state of mechanical fitness, a substitute vehicle, unknown and unsurveyed by the Insurer, would, or might, substantially increase exposure of the Underwriter to risk. But this underwriting factor was evaluated retrospectively by the payment of an added premium if required. The Insurer's needs were thus satisfied if it received notice within 72 hours so it could determine whether added premium should be assessed.

3. "Reinstatement. Unless this policy is written on a gross receipts reporting

amount paid or payable by the Insured on prior claims unless the policy were reinstated and additional pro rata premium paid.

Two losses figure in this case though only the later one is directly involved. On August 5, 1953 while the Egg Express Tractor 1-Trailer 1 Unit [4] was hauling vegetables, the vehicles and cargo became virtually a total loss. To enable the carrier to discharge its obligations to the cargo shippers, Egg Express made a claim almost immediately for that loss for approximately $4300. Three weeks later, on August 27, 1953, the carrier's Unit [4] Tractor 7-Trailer 7, near Wrightsville, Georgia and 60 hours on its southbound journey from New England, was in a casualty causing fire and a total loss of its cargo of unhatched hatching eggs in what some called the "omelet" accident. Egg Express promptly made claim and the jury verdict fixed the value of the cargo of eggs for which carrier was liable to shippers at $9,942.90.

■ While the evidence was sufficient for the jury to infer that from the dealings with the Insurer's agents in the immediate investigation of the first, August 5, loss, Egg Express did notify it that a substituted unit was being employed, it is uncontradicted that for subsequent Units 2 to 6 (approximated for convenience), no subsequent notice of substitution at all was given to the Insurer.

This brings us right to the nub of the Assured's case and without which all—eggs, truck, trailers, and insurance—is lost: Egg Express asserts that as the loss occurred approximately sixty hours after Unit 7 was first obtained by Egg Express, it still had twelve hours of

basis, every claim payable hereunder reduces the amount for which this Company may be liable as to the truck in respect to which the disaster occurred, by the sum actually paid, or payable, unless the same be reinstated by the Assured and accepted by this Company by endorsement hereon, in consideration of payment of additional premium at pro rata rates."

grace before the 72-hour notification period, note 2, *supra*, expired. The Insurer counters, seemingly because the word "warrants" (note 2, *supra*) is used, that once the first substitute (Unit 2) was withdrawn and no successive notices of substitution were given to bring Units 3, 4, 5 and 6 under the policy, there was somehow a "breach" of the policy by the Assured, so that the 72-hour grace period provision did not apply. The inherent weakness of this position was revealed when, on the argument here, Insurer's counsel had to concede that had the Assured given written or telegraphic notice to the Insurer the *moment* Unit 7 first came under the control of Egg Express, there would be no doubt that the coverage existed.

Solution of this problem is in no way aided by an attempt to read the word "warrants" in the common insurance sense which treats falsity of a "warranty" as absolutely material, but requires proof of materiality for a mere misrepresentation, Selph v. Hanover Fire Insurance Co. of New York, 154 Fla. 287, 17 So.2d 220; Providence Washington Insurance Co. v. Rabinowitz, 5 Cir., 227 F.2d 300; Madden v. Metropolitan Life Ins. Co., 5 Cir., 138 F.2d 708, 151 A.L.R. 984, certiorari denied, 322 U.S. 730, 64 S.Ct. 945, 88 L.Ed. 1565, or as an absolute and binding obligation to do some act, continue a condition or refrain from specified action. Cf. Fidelity-Phenix Fire Insurance Co. of New York v. Pilot Freight Carriers, Inc., 4 Cir., 193 F.2d 812, 31 A.L.R.2d 839; Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715, 1943 A.M.C. 27, certiorari denied 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711; Saskatchewan Govt. Ins. Office v. Spot Pack, Inc., 5 Cir., 242 F.2d

4. These identifying numbers are arbitrarily added by us for convenient reference to emphasize that, after total loss of Unit 1 in the August 5, 1953 accident, approximately 6 other units had been substituted for successive trips and the unit in use August 27, 1953 was approximately the seventh substitution.

385. This is so because the clause itself is stated in terms of a *privilege* of the Assured. He need not substitute. He need not, he may not wish to, include replacement vehicles under the policy. Obviously, if for some reason the original scheduled vehicle is destroyed, sold or totally withdrawn from use, the Assured commits no breach in not procuring a replacement or putting it under the policy. Indeed, the Insurer gains, not loses, from such action for its premium is single and earned (until cancelled) whether operations do or do not go on.

What the clause does require if coverage is to exist is that within 72 hours written notice must be given. Such a requirement, and which we may assume *arguendo*, is absolute and commands literal, not merely substantial, compliance, would have been as well expressed had the clause used words such as: the Assured "shall," "must," or "promises to," report in writing the substitution.

But however expressed, it means that the option is up to the Assured. He can substitute or not as he alone wishes. But if he does, he *must* give written notice within the grace period. That being so, the privilege is a continuing one throughout the term of the policy period. It can be exercised as often as the Assured replaces the vehicles. Each substitution is a separate one, and lack of coverage for want of notice as to any one or more replacement vehicles does not affect a later one in which grace period notice is timely given.

The rights, of course, became fixed as of the moment of the loss, August 27, and occurring, as it did, within the period fixed for notification of automatic coverage for newly acquired or substituted vehicles, it is within the policy coverage. Hoffman v. Illinois National Casualty Co., 7 Cir., 159 F.2d 564, 566;

Birch v. Harbor Insurance Co., Cal.App. 1954, 272 P.2d 784; Western Casualty & Surety Co. v. Lund, D.C.Okl., 132 F. Supp. 867, 870; General Ins. Co. of America et al. v. Western Fire & Casualty Co., 5 Cir., 241 F.2d 289.

■ The contention that because Trailer 7 was owned by Holdeman and Tractor 7 by Cooper and driven by Fannon whose pay came from Cooper,[5] Unit 7 was not, as required (notes 1 and 2, *supra*) "operated by" the Assured is quickly disposed of. The evidence overwhelmingly demonstrated that as a common carrier Egg Express, typical of operations as exempt carrier of agricultural products, see Ex Parte No. MC-43, Lease and Interchange of vehicles by Motor Carriers, 52 MCC 675; American Trucking Ass'n v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337, used both owned and leased equipment. Under the arrangement between Egg Express and the egg shippers by which they looked to it as the carrier issuing the bills of lading, making the contract of afreightment, and the person responsible for the safe custody and delivery of the goods, the carriage of the goods which gave rise to the liability insured against by this policy, was clearly the operation of Egg Express whatever might have been the liability of the tractor owner or driver in other situations. United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671; Thomson v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513; Gulf Coast Towing Co. v. United States, 5 Cir., 196 F.2d 944; United States v. Silk (Harrison v. Greyvan Lines), 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757.

The question then becomes: is the Insurer liable for the full amount (fixed by the jury at $9942.90) of the second loss or only up to the balance [6] remaining

5. Unit 7 was under oral lease to Egg Express effective approximately 6:00 to 7:00 p. m. Monday, August 24, when the Unit was placed at disposal of Egg Express to load southbound eggs. Charter hire, $350 for the trip, was split 80/20% between tractor (Cooper) and trailer (Holdeman) owner respectively. The

driver, Fannon, for his compensation received 20% of the tractor's 80%. See Ex Parte No. MC–43, Lease and Interchange of Vehicles by Motor Carriers, 52 MCC 675.

6. The endorsement, dated October 22, 1953, on the usual form stated:

after deducting from the $10,000 policy limit the amount of the first (August 5) loss, approximately $4300. Up to this question we are all of one mind. As to it, the Court is divided and Judge BROWN'S contrary and minority views on this point are set forth in his dissent.

For the reasons we indicate the Court is of the opinion that the reinstatement clause, note 3, *supra,* required some character of action by the Assured after the first loss and since none was taken prior to the occurrence of the second one, the face amount of insurance available was reduced to that specified in the endorsement of October 22, note 6, *supra.*

■ We start with the proposition that our function is not to write insurance contracts. We are not underwriters. We must apply them as written by the parties, C. E. Carnes & Co. v. Employers' Liability Assurance Corp., 5 Cir., 101 F.2d 739; Maryland Casualty Co. v. Southern Farm Bureau Casualty Insurance Co., 5 Cir., 235 F.2d 679, even though the result compelled by the plain words used may appear or be thought to appear to be unreasonable, unduly harsh, or stringent. We cannot ignore them. We cannot substitute others for them. So at the start we must ascertain whether the words used really leave a doubt or create uncertainty which needs construction. If not, the words control.

■ With this approach the clause announces in simple terms that the insurance will be reduced by the sums paid or payable unless application for reinstatement is made and an added *pro rata* premium paid. This contemplates two actions by the Assured: (1) application, i. e., a request, and (2) payment or an obligation to pay more premiums. Only the Assured can determine whether he desires the added insurance or wishes to assume a liability

for its cost. Under the scheme of this insurance, the Assured should not have the *protection* unless it is equally clear that the Insurer will receive the added *compensation.* This may be quite a different matter from the *time* when the added compensation is ascertainable or even payable. And yet that may occur if the Assured need take no action until his first claim is actually paid or liability therefor is authoritatively acknowledged by the Insurer. For the Assured, confident in the knowledge that he need take action only when decisive payment (or acknowledgment of liability) is made, could perhaps for the remainder of the policy term have the protection of the full face amount without any cost to him. If a subsequent loss were to occur, he would then quite obviously be willing to pay the added premium. On the other hand, if no subsequent losses were to occur or did not exceed in total the reduced amount of insurance, no added premium would be due. At least it would hardly be collectible since the obligation would depend on the secret undisclosed desire of the Assured to have (and pay for) it if needed, otherwise not.

This exposes the Assured to no real difficulty. For he will know of the first claim, both from the physical occurrence producing the cargo loss or damage and, more significantly, from the submission of it to the Insurer by proof of loss or other formal request for payment. The Assured may perhaps not be able to forecast accurately its future legal life from claim to ultimate payment, and what he thought was a claim may turn out, or by some judges be turned out, to be none at all. But he will at least know what it is he asserts is payable. And when he knows that, and asserts it as well, it is not unreasonable for him then to determine and announce in some unequivocal fashion his desire to obtain the added insurance

"It is understood and agreed that under the reinstatement clause contained in the conditions of the policy contract, the coverage limits of this policy are reduced to the extent of the amount of

claim paid; namely the coverage limits are reduced to $6,569.14."

The reduction was therefore fixed by the Insurer at $6,569.14 and not, as might be supposed, approximately $5,700 ($10,000 minus $4,300).

and his willingness to pay the added cost when and as, if ever, any is ascertained and becomes due.

Nor do we think this does any violence to legal concepts. For a claim is "payable" if it is due under the policy. Whether it is *due*, i. e., owing under the policy, is an ultimate legal question quite apart from the matter of *when* that determination is made. It may be years and courts later, but if the final decision is one of liability under the policy, the claim was, in a legal sense, payable,[7] from the outset, that is, from the time submitted for payment.

Illustrating that such a construction of the policy terms is a reasonable one, the facts of this particular case afford no basis for any apprehension that fine-print technicalities misled the uninformed. The Assured happened also to be a lawyer professionally capable of interpreting insurance contracts and his insurance was handled by an experienced broker whose acts of this kind in Florida are normally the assured's Centennial Insurance Co. v. Parnell, Fla., 83 So.2d 688. The broker knew of the first loss and his client's earlier expressed desire to maintain the full level of insurance but purposefully refrained from advising the Insurer that the Assured desired to reintate the policy. He freely acknowledged that it could have been done and his only excuse was that he didn't see how the premium could be calculated until the first loss was reduced to tangible terms.

The Assured did not comply with the reinstatement clause. It was operative and valid and by its terms reduced the coverage accordingly.

The judgment as to the issue of reinstatement is therefore reversed and remanded for further and not inconsistent proceedings. Otherwise it is affirmed.

Affirmed in Part and Reversed and Remanded in Part.

JOHN R. BROWN, Circuit Judge (dissenting in part).

I must, with deference, dissent from the Court's action on the issue of reinstatement. As I view it, the decision ignores the fact that the language used can be read in at least two ways. With that choice open, the decision seems to me to abandon the Florida and universal rule of choosing the construction which broadens, not lessens, coverage. And worse, as I read it, it adopts a construction which produces incongruous absurdities with no real benefit to either party but which cause the policy to fail in the historic function of insurance to meet the needs of the business being insured.

At the outset, the contract itself prescribes its own standard of "payable" for the Payment of Loss clause, note 7, court's opinion, *supra*, states that:

> " \* \* \* claims under this policy shall be due and *payable* sixty (60) days after presentation and acceptance of proofs of \* \* \* loss \* \* \*."

Since the second casualty occurred 22 days after the first and long prior to the 60-day period, the claim for the first loss was not "payable" and no court with a full arsenal of writs could have compelled payment prior to 60 days after August 5.

If we must look to the contract terms, why should we not start here? Why may

---

7. Of course, under the policy, the Insurer, perhaps for verification, further investigation, etc., is given 60 days after acceptance of proofs of loss in which to make the actual payment:

"Payment of Loss. All adjusted claims under this policy shall be due and payable sixty (60) days after the presentation and acceptance of proofs of interest and loss at the office of this company (the amount of any indebtedness due this company being first deducted)."

Specific reference to "adjusted" claims and "acceptance" of proofs of loss indicates that this clause relates to the time of payment of an admitted claim once liability has been accepted for it. For the purpose of reinstatement, however, a claim could be legally owing and due in the sense of the Insurer being liable for it even though by the terms of the contract, the time of such payment might be deferred.

we not say that the Insurer has prescribed its own definition of "payable"?

Next, while the Court asserts that construction here is merely applying the words used, the force of its main argument results in the words being ignored. The Court argues that it would be unreasonable to expose the Insurer to additional liability during the interim between the occurrence of the loss and the date of its actual payment (or acknowledgement of liability) since there would be no basis for imposing an obligation on the Assured for the added premium. To avoid this, it holds the Assured must notify the Insurer at the time of the loss or, at the latest, at the time of submission of the claim. And it requires that at the time of notification the Assured must simultaneously, either expressly or impliedly, agree to pay the added premium when computed. But the effect of this is to change the contract altogether. The contract says the assured shall notify and pay the added premium when the claim is "paid or payable." Whatever the term might mean, it is certain that "paid or payable" is not synonymous with the "time of the occurrence of the loss" or the "time of the submission of the claim."

In its zeal to take the words used, "according to the law of the Medes and Persians which altereth not," the Court unavoidably abandons them altogether.

But since what seems so clear to me is apparently neither clear nor convincing, I feel compelled to analyze it further to demonstrate that a proper "interpretation" or "construction" of the policy leads back to this same result.

The first thing is that this is something more than mere notification of the Insurer. It is, of course, correct to say that since it is uncontradicted that up to the time of the second loss (August 27), no formal request for reinstatement was made, the problem actually concerns the *time* such a request must be made under the reinstatement clause, note 3, *supra*. But a much more important reflex of this is the *time* the reduction in coverage becomes operative. For if, as the Insurer contends and the Court now holds, the term "claim payable hereunder" means a demand for which the company may *ultimately* be determined to be liable, the amount of the insurance is *automatically* reduced at the time of the occurrence [1] giving rise to the loss no matter how long the process of claim adjudication, nor what the position, attitude, or contention of the Insurer may have been in the interim.

This produces incongruities [2] of the kind which, reflecting the wisdom and

---

1. Not to be forgotten is the nature of this insurance: carrier's liability. The carrier as Assured must give *prompt notice* of occurrences likely to give rise to losses:

   "Notice of Loss. The Assured hereby agrees that every loss or damage which *may* become a *claim* under this policy shall be *immediately* reported in writing with full particulars to this Company, or to the agent of this Company issuing this policy, and shall also file with this Company or its agent within thirty (30) days after the date of loss, detailed sworn proofs of loss. Failure by the Assured to *report* the said loss or *damage* and to file written proofs of loss as herein provided, shall *invalidate* any claim under this policy." (Emphasis supplied.)

   But when or where, whether, or to what extent, claims of liability against that carrier (the subject of the insurance) will be made depends on the ac-

tion of third persons—the cargo shippers.

2. For example: the carrier, for private contract carriage has a transportation contract signed by the shipper exonerating it from liability for damage caused by failure of mechanical equipment if due diligence were used to make it truckworthy. At the time of the shipment, the loss, the making of claim by shipper and through all courts but the last one, the contract was valid. Years later the final court invalidates it and all similar contracts. See, e. g., Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911; Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933. The effect is to revive a claim for the "first" loss which formerly had no real legal value.

   For example: immediately on receipt of prompt claim for the first loss, the insurer categorically denies liability for any one or more of policy exclusions (a)

non-punitive purpose of the traditional rule on construction of insurance contracts where the wording warrants two intrepretations, Poole v. Travelers Insurance Co., 130 Fla. 806, 179 So. 138; New York Life Insurance Co. v. Jones, 5 Cir., 224 F.2d 33; Globe & Rutgers Fire Ins. Co. v. Baylen Street Wharf Co., 5 Cir., 38 F.2d 197, persuasively demonstrates, not that the Insurer cannot write a contract merely because its terms might seem to a court harsh or stringent, but that it is not likely that such a result was intended by an Insurer issuing policies whose purpose is to meet a business need.

And choosing between these alternates, the interpretation that the terms, "every claim payable hereunder" and the "sum actually paid, or payable" refer to those prior losses (a) for which the Insurer has in fact already made payment or (b) in which it has authoritatively acknowledged to the Assured that it is liable, meets both the practicable needs of the trucking business and subjects the Underwriter to no disadvantage whatsoever. This is so because the sole purpose of reinstatement is to allow the Insurer to charge and receive an additional premium, a right which is preserved inviolate by requiring application for reinstatement and payment of added premium when conditions (a) or (b) are satisfied.

Indeed, a contrary interpretation leads to absurdities for the Underwriter as well. It is plain from the provision that the additional premium is to be calculated at "pro rata rates" that, so long as the policy is effective and until authoritatively cancelled, the Assured has a right to reinstatement and it is not the case of an application for *new* insurance which the Insurer can or may reject.[3] If then the only concern is the *amount* of the added premium, how can it be determined until the prior loss has been reduced to tangible terms? Until that prior loss satisfies condition (a) or (b) above, mere notice that the Assured invokes his right to reinstatement and will pay when and as the added premium is determined is of no utility to the Underwriter. All the Insurer could do would be to acknowledge the anticipatory request with assurances that when and as the added premium could be calculated, it would so treat it. That, of course, would be merely to repeat, in different words, what, I think, it is the policy now states.

I have written so extensively because, as is the genius of the Anglo-American concept of a common law growing from decision and stated reason by court opinions, this case, in the flood of insurance litigation, the first and only English or American decision on this problem of reinstatement which my research has uncovered, may have transcendent impor-

---

through (k) or, as done here on September 2, 1953, for non-scheduled vehicles under an erroneous interpretation of the Substitute Vehicle Clause. Three years and two courts later, the defenses are overruled and the insurer is held liable.

For example: immediately after the prior claim for a total or substantial loss by deterioration of non-refrigerated perishables occasioned by the collision upset of the trailer, the Insurer denied liability under clause (d) excluding loss or damage "due to loss of market or delay * * *" and liability is not fixed until years later then final court rules that the proximate cause of damage was the collision not the "delay." E. g., Lanasa Fruit S/S & I. Co. v. Universal Insurance Co., 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422, 1938 A.M.C. 1.

For example: on a single trip, during non-office hours of the dead of one night, a truck on the outward trip has a slight traffic accident causing only superficial damage to the vehicle but producing partial cargo damage, the dollar value of which was then not ascertainable but subsequently fixed at $4,000. The driver, unable to reach his office, loads his return cargo and proceeds on when the vehicle and all cargo is a total fire loss ensuing from a blowout upset.

3. This dovetails with the unlimited right of substitution of vehicles, note 2, Court's opinion, supra, in which the Assured has the sole option and the Insurer is limited to fixing the added premium. Obviously the substantial underwriting factor is confidence in the business integrity of the Assured.

tance for the future. Not only that, an extended research in available texts,[4] English and American, both legal and practical, reveals that this matter has apparently not precipitated any particular problems in the day-to-day operation of one of the world's largest business activities comprehending, as it does, the tremendous expansion of inland marine coverages in which classification motor truck liability policies fall. Since we may have the unique distinction of making, with the imprimatur of law, the sole deliverance on the subject, we should, when alternates inflicting no real detriment on the Underwriters are reasonably open, be loathe to launch a construction which fails to offer the coverage which businessmen need and leads only to a superficial unreal paper benefit to the Insurer.

Application of these principles to this case demonstrates, I think, their soundness. Almost immediately upon the commencement, August 5, of the investigation by the Insurer's agent of the first loss, the Insurer questioned liability. First it was because the vehicles involved were not scheduled and hence not covered. This was apparently resolved when an endorsement dated August 24, 1953, (but whose date of delivery to the Assured is nowhere shown) was issued specifically covering the vehicles in the first accident. But notwithstanding this, the claim was not paid until December. And the jury, observing and hearing the head Claims Manager of the Insurer who, between Scylla and Charybdis, tried to assert that all issues were resolved upon the execution of the August 24 endorsement, but then, though pressed vigorously on cross examination, had no reason for delaying payment three more months, had ample ground to infer that, for good or bad reason, the Underwriter, despite pressure from the Assured and his shippers, was persisting in a denial of liability. And, at the most, the first and only act whichever approached an acknowledgement of liability or a communication of that fact to the Assured was the endorsement[5] of October 22, 1953, note 6, Court's opinion, supra, which, in stating that the "* * * limits of this policy *are* reduced to the extent of the amount of claim *paid*" was patently inaccurate with payments still a month or more removed and may well have been thought by the jury to be a mere self-serving document in the Company's plan, shortly followed with no statement of its reasons, by a cancellation of the policy altogether as of November 4, 1953 just ten days before its normal expiration.

4. Attesting, perhaps, that reinstatement clauses present no real problem when administered and applied in a practical manner from the viewpoint both of assured and underwriter, the texts merely refer to the particular reinsurance clauses generally under the heading of the type of insurance, marine, hull, marine cargo, fire, inland marine, etc., but in none is there any discussion even remotely related to our problem. See, e. g., Winter, Marine Insurance, Its Principles and Practice, McGraw Hill Insurance Series (3rd Ed.1952), p. 150, 151; Rodda, Inland Marine and Transportation Insurance, Prentice Hall Inc., 1949, p. 29, p. 411, p. 493; Appleman, Inland Marine Insurance, McGraw Hill Book Company, Inc., 1934 Chapter II, Transportation Policies, Sections 53, Chapter IV, Other Transportation Policies, Section 63f, Chapter VI, Section 94; Mowbray, Insurance, Its Theory and Practice in the United States, McGraw Hill Book Company, Inc. (3rd Ed.

1946), Chapter VI, Fire Insurance Contracts, p. 66, p. 84, Burglary, Robbery and Theft Insurance, p. 134; Annotation of the 1943 New York Standard Fire Insurance Policy, 1953, Section of Insurance Law, American Bar Association, p. 12; MacLean, Inland Marine Insurance Loss Principles and Practices, The National Underwriter Company, Cincinnati, Ohio, 1952, p. 131, 133, 141, 145, 162; Dover, Analysis of Marine and Other Insurance Clauses, H. F. & G. Witherby Ltd., London (6th Ed.1950), on institute reinstatement clauses, p. 108, 214, 314, 534.

5. The endorsement is set out in note 6, Court's opinion, supra. Of special interest is the phrase "are reduced" and "claim paid." The phrase *"are* reduced" in the present tense indicates that it was intended to be presently effective. Nowhere is a retroactive date indicated nor is the "paid" loss identified as the occurrence of August 5, or otherwise.

The Insurer took the flat position that the limits had been reduced and reinstatement was not open to the Assured. It did not seek, as is clearly due, the added premium if this position were untenable. But believing that the rule which I expound would begin its life with an unfortunate congenital infirmity if the Insurer were held to have increased coverage on the expectation of an added premium, and yet was denied it by the technical rules of procedure, I would exert the power, 28 U.S.C.A. § 2106, regardless of technical appellate rules, and remand the case to determine the amount of the additional premium at pro rata rates.

I think the construction urged and adopted defeats the business purpose which underwriters and insured set out to achieve. With the legitimate need for, and an opportunity of, choosing, we have taken a course which means that the insurance sold, bought and paid for, does not meet the known needs of a business activity. Only the plainest of words should compel or authorize such result.

Such words, I think with deference, are lacking here, and I accordingly dissent on the issue of reinstatement.

