### HENJES v. ÆTNA INS. CO. et al.
### No. 73.

Circuit Court of Appeals, Second Circuit.
Jan. 4, 1943.

Robert F. Donoghue, of New York City (Frank C. Mason and Benjamin Lewis, both of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (John M. Aherne, of New York City, of counsel), for appellees.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This action was originally brought against the defendant insurance companies on a policy of marine insurance in the Supreme Court, County of Kings, New York. It was duly removed to the Dis-

trict Court for the Eastern District of New York and tried there to a jury. At the close of all the evidence the court directed a verdict for the defendants on the ground that the breach by the plaintiff of a promissory warranty in the policy had been proved and was a complete defense to the suit. This appeal is from the judgment entered on that verdict.

In March 1940, the defendants issued a time marine insurance policy to the plaintiff covering for one year his vessels named in an attached schedule against perils mentioned which included perils of the sea. During the next month the coverage of the policy was extended by an indorsement to include damage to the plaintiff up to the limit, and for the time, stated for the loss, destruction or injury to his tugboat "Edwin Duke" from the perils the original policy covered. The policy so issued contained a promissory warranty which applied to the "Edwin Duke" that confined her use and navigation to New York Harbor and nearby waters named but " * * * with privilege to operate in Great South Bay via Fire Island Inlet, including operation in the inlet subject to obtaining fair weather reports prior to clearing New York Harbor and warranted not in excess of one vessel in tow: * * *"

During the policy period the "Edwin Duke" sank under circumstances to be related and became a total loss; the plaintiff duly filed proof of claim; the defendants refused to recognize any liability under the policy and this suit was brought with the result above noted.

The "Edwin Duke" was a steel tugboat sixty-nine feet long having two hundred horse power from a Diesel engine. She was lost in the following way: After getting the required fair weather report she left New York Harbor on the evening of December 3, 1940, with one barge loaded with rock in tow for Fire Island Inlet. After passing the fairway buoy off Rockaway Point she became part of a tow made up of the five hundred horse power tug "Gerd Henjes," also owned by the plaintiff, which had been towing two rock laden barges and the plaintiff's two hundred and forty horse power tug "Helen Barbara" which had been towing another barge also loaded with rock. This combined tow with the "Gerd Henjes" in the lead followed in tandem by her barges, the "Edwin Duke" with its barge, and the

"Helen Barbara" with its barge, proceeded without trouble to Fire Island Inlet where the barges were left. About a quarter past one in the afternoon of the next day, December 4, 1940, the three tugs left the Inlet bound west for the Coney Island seawall. They then were in a tow made up in tandem in charge of the captain of the "Gerd Henjes" which consisted of the "Edwin Duke" in the lead with a hawser to the bow of the "Helen Barbara" that had in turn a hawser from her stern to the bow of the "Gerd Henjes" which had four empty barges hanging in tandem on a hawser from her stern. When the tow left Fire Island Inlet the weather was clear and the sea calm. After it had gone westward at full speed for about three hours the weather changed. The wind came up from the southwest to reach a velocity around thirty miles an hour about five o'clock and the sea came up with it until by half past six the waves were running about twenty-five feet high. The flotilla kept on very slowly after this change in the weather.

Between six and seven o'clock the captain of the "Gerd Henjes" reported to the captain of the "Edwin Duke" by radio telephone that his hawser to the barges had parted and directed the "Edwin Duke" to cast off and come back to help pick up the barges. The "Duke" did so but before it could help, the "Henjes" had succeeded in making fast to the barges again and the "Duke" resumed its position at the head of the tow. The same thing occurred with the same result about half past seven. And then at about a quarter past eight more serious trouble occurred. The men on the barges then began flashing lights to the "Gerd Henjes" and its captain ordered the "Edwin Duke" to cast off and go back to help them. The "Duke" complied and found that the last three barges had broken away from the first and were rapidly drifting toward the shore. After considerable difficulty the "Duke" succeeded in heaving a line to the first of the three barges and getting a hawser fast to its center bitt, the forward bitts having been broken. When the "Duke" attempted to break the drift of the barges, however, it proved to be unequal to the task and was pulled with them toward the shore until it touched bottom. After some pounding on the bottom for twenty minutes or so the captain of the "Duke" decided that he could not save the barges and cut loose in an attempt to take his

vessel to safety. He reported to the captain of the "Gerd Henjes" by radio telephone asking him to try to get help from the Coast Guard and telling him that the "Duke" would try to make Coney Island. About half past nine that night after the tug had suffered severely in the wind and waves and its radio had stopped working, its captain saw a light about five miles out to sea on his port hand and sent out distress signals which were answered by signals showing that it was a Coast Guard boat. It proved to be the Coast Guard cutter "Pontchatrain" which came up and took the captain and crew off the tug, then so low in the water that attempts to tow her were futile. The tug soon sank and was a total loss.

■ It is clear that when the "Edwin Duke" was lost she was not towing in violation of the warranty in the policy. It is also clear that both on her eastbound voyage to Fire Island Inlet and at the beginning of her westbound voyage from there she was towing in excess of one vessel. It has been argued that she was a helper tug in the westbound tow acting under the orders of the captain of the "Gerd Henjes" so that what she did was not contrary to the warranty limiting her tow to not more than one vessel in these waters. It does not, however, change her status under the policy to call her a helper tug. She was in fact one of three tugs which were all pulling four barges in one tow. All the tugs were towing in a common venture and each was helping the others as three in line and on lines would ordinarily do in the joint effort to tow barges hanging to a line from the last of them. The "Edwin Duke" was towing, therefore, more than one vessel when the storm came up which created the subsequent conditions that caused her to sink. See Shipowners' & Merchants Tugboat Co. v. Hammond Lumber Co., 9 Cir., 218 F. 161; The Bordentown, D.C., 40 F. 682; The Geo. W. Pratt, 2 Cir., 76 F.2d 902.

Had she been lost while actually engaged in that towage the non-coverage of the policy would have been clear enough and so the problem of decision on this appeal is narrowed to the questions (1) was she freed from her obligations to her tow, which while present prevented her from towing within the policy coverage, before she was lost; (2) if so, was her loss attributable to injuries received while performing her duty to her tow or to perils of the sea encountered after she ceased to tow; and (3) if her loss was attributable to the latter was she then covered by the policy.

■ As to (1) there can be no doubt of the duty of the "Edwin Duke" to go to the assistance, as she did, of the three barges which had broken away. She could not abandon them until all reasonable effort to save them had been made. The Jos. F. Clinton, 2 Cir., 250 F. 977, 979. That continuing duty prevented her from being treated as an attempting salvor as the appellee contends to avoid the warranty in the policy. But whenever she had fulfilled her duty to her tow she was, of course, no longer under any obligation to it. That was when she deliberately cut her hawser. We think the evidence is so clear that she had done all she safely could for her tow, and perhaps even more, at the time she cut her hawser after she had been pulled ashore and had touched or pounded the bottom for some minutes that the point may be decided as a matter of law. Consequently, we can, and do, hold as a matter of law two things. The first is that from the time the "Edwin Duke" was in danger from the storm until she cut away from her tow to try to save herself she was towing in violation of the warranty in the policy and was not at the risk of the insurers. The second is that when she was cut away from her tow she, having fulfilled her legal obligation to it, was at liberty to become a towless tug whenever she saw fit.

The decisive question remaining to be decided is whether the tug's breach of the warranty took her completely and forever out of the coverage of the policy or merely suspended that and, if the latter, whether it reattached before the vessel was a total loss.

■ The warranty in the endorsement by which the policy was extended to cover the "Edwin Duke" was silent as to whether its breach would work a forfeiture of the policy or whether, if the breach were cured during the term, the insurance would then become effective again. Some light as to what the parties intended is shed on this point by the provision in the original policy regarding the effect of deviation. That made the policy "null and void" for any "deviation beyond the limits named" but whenever the vessel returned within those limits the policy was to reattach if "the vessel shall then be in all respects

seaworthy." It is a general rule of construction that where the language of a policy of insurance may reasonably be construed in more than one way the meaning beneficial to the insured is to be given effect by resolving fair doubts against the insurer who chose the language which created them. Ashenbrenner v. United States F. & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; DeHart v. Illinois Casualty Co., 7 Cir., 116 F.2d 685. That is particularly applicable to a time policy of marine insurance. Smith v. Northwestern F. & M. Ins. Co., 246 N.Y. 349, 358, 159 N.E. 87. This tug would, the parties knew, be expected to work many tows during the policy period. It certainly could not have been unexpected that for some reason or other there might sooner or later be a breach of this promissory warranty. At least that possibility was inherent in the business. Being so, it would be going far to hold that language which itself stopped short of a forfeiture should be construed to create one when the same policy expressly provided, in respect to a breach so fundamental as deviation is considered in marine matters, that return within the limits in a seaworthy condition would put the insurance in force again. Had the insurers meant to have a breach of the warranty put the tug beyond the coverage of the insurance for the remainder of the term while the premium based upon insurance for the whole term was kept they should have made that convincingly clear. Hennessey v. Manhattan Fire Ins. Co., 28 Hun, N.Y., 98. We cannot assume in their favor stipulations they saw fit to leave out especially when the assumption would work a forfeiture. A construction which amounts to a forfeiture is to be avoided wherever possible. Travelers Protective Ass'n v. Jones, 5 Cir., 91 F.2d 377; Darrow v. Family Fund Society, 116 N.Y. 537, 22 N.E. 1093, 6 A.L.R. 495, 15 Am.St.Rep. 430. Accordingly we believe the intention of the parties to this policy, as shown by the language of it and of the endorsement, must be taken to be that such a breach of the warranty as was here proved would suspend the insurance during the time the breach remained uncured and that the insurance would reattach when the breach was ended. It is the intent so gathered which determines the nature of the contract. See Imperial Fire Ins. Co. v. County of Coos, 151 U.S. 452, 14 S.Ct. 379, 38 L.Ed. 231.

In so holding we have treated the breach of warranty as a casual one as distinguished from persistent, long continued, often recurring ones which would show deliberate disregard of the insured's obligation to fulfill the promissory warranty. The latter was not proved and therefore we leave open its possible effect as a defense to this action. See Atlantic Fruit Co. v. Hamilton Fire Ins. Co., 251 N.Y. 98, 168 N.E. 184; Shuster v. National Surety Co., 256 N.Y. 150, 175 N.E. 655. Treating this policy now as one which might reattach upon the removal of the kind of breach of warranty which here suspended the insurance, we are obliged to determine, in the absence of policy stipulations making the point clear, when, if at all, the insurance did become effective again.

There is in the United States an implied warranty by the insured in a time marine policy that the ship is seaworthy at the time the policy period begins. Union Ins. Co. v. Smith, 124 U.S. 405, 427, 8 S.Ct. 534, 31 L.Ed. 497. But that is true only when the vessel is in port at the time. New York & P. R. S. S. Co. v. Aetna Ins. Co., D.C., 204 F. 255. When the insurance is to come into being on a ship on a voyage the insurer takes her as she may be. Moreover, it can be of no legal significance that the towage, which suspended the policy because it was a breach of the warranty, was ended by abandonment, rather than by accomplishment, of the towage. The "Duke" ceased to be a towing tug and then the breach of the warranty ended.

Yet it does not follow that when the breach of the warranty ended, the suspension of the policy was ended at the same time. It merely may have become effective once more. That would be so under our construction of the policy if a tug in clear weather and water towed in breach of the warranty but relinquished the tow to another tug and became an unburdened tug while in the same condition and circumstances she was before the breach.

But our construction need not, and does not, permit a tug owner to break the warranty by towing more than one vessel and when trouble comes get his insurance back in force in ample time as a practical matter merely by cutting the line to the forbidden tow. A tug owner cannot thus have the benefit of low-rate insurance with more extensive towage

720

operations than his policy permits. When a loss is claimed after the insurance has been suspended by a breach of the warranty the insured must, of course, prove that it was sustained while the policy was in force and this required proof in this instance that the sinking, though occurring after the policy reattached, was not caused by injuries the vessel received while the insurance was suspended. The insured may not by breach of warranty increase the risk and put that added burden upon the insurer. The latter need take back only what he had before and that obviously did not include the dangers faced by the tug in fulfilling her duty to her tow of this kind at this place. The undisputed evidence here was that the vessel while the policy was suspended became involved in a severe storm; was pulled into shallow water because she was too small for the job she tried to do; pounded on the bottom for about twenty minutes; and then was freed of her tow only because her own need to seek safety from dangers so created required her freedom to such an extent. Even so, her every effort to save herself was fruitless though she had the aid of a Coast Guard cutter. That evidence, we think, left no fair question of fact to be decided by the jury. It pointed, as the actual cause of the loss, too surely to events which happened while the insurance was suspended for us to find that it was error to direct a verdict on the ground that the plaintiff had failed to prove a cause of action.

Judgment affirmed.