**NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY,**
Libelant,

v.

William Stanger GRAY, one of the Lloyd's Underwriters
and

Orion Insurance Company, Limited, Insurance Company Member of the Institute of London Underwriters, Respondents.

United States District Court
S. D. New York.
May 24, 1956.

Kirlin, Campbell & Keating, New York City, Edward L. Smith, New York City, of counsel, for libelant.

Dow & Symmers, New York City, Daniel L. Stonebridge, Raymond W. Mitchell, New York City, of counsel, for respondents.

CASHIN, District Judge.

This is an action in admiralty by the libelant, New York, New Haven and Hartford Railroad Company, for recovery on two marine insurance policies issued by the respondents, William Gray of Lloyd's underwriters and Orion Insurance Company, Ltd. of the Institute of London Underwriters.

### Findings of Fact

1. Respondents duly issued to the libelant in London, England, two marine insurance policies, identical in form. These policies were in full force and effect on February 9, 1951 and read in part as follows:

"Touching the Adventures and Perils which we the Assurers are contended to bear and do take upon us in this Voyage, they are, of the Seas * * * and all other Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said goods and Merchandises and Ship, etc., or any Part thereof * * *.

"2. $500,000 in all any one accident with limits as below *on all goods, wares, merchandise, baggage, and other property*; including articles excepted in the printed part of this policy; and *on advanced charges* and *on freight charges* up to point of occurrence of loss; *belonging to*

the assured or held by it in trust or custody as carrier or forwarder, and, for which it may be liable, while same is in or on cars on Floats owned or employed by said Railroad Company, and/or while said cars are being hauled on or off said vessels; *and on cars belonging to the assured or in its use or possession*, while the same are on said floats or being hauled on or off of said vessels".

2. On February 9, 1951, libelant's steel Carfloat No. 60, a three track float, approximately 327 feet long, with a depth of 10 feet 6 inches, a draft (light) of 3 feet and divided into 17 separate compartments, was located in the Harlem River Basin off libelant's Mott Haven Yard. On the carfloat were fastened thirteen empty gondola cars, five on the starboard side, five on the portside and three in the middle track. On the morning of February 9th libelant's employees commenced loading the gondola cars with steel concrete reinforcing rods. Sometime after 2:00 p. m. libelant's employees became aware that the bow of the carfloat was settling and libelant's Assistant Marine Superintendent and Marine Supervisor, among others, were duly informed.

3. Sometime after 3:00 o'clock the Marine Supervisor inspected the float and found water in the various compartments as follows: Compartments No. 1—4 feet; No. 2—1½ feet; No. 4—2 feet; No. 7—1 foot; No. 8—2½ feet; No. 12—2 feet. The carfloat was needed the next day in its regular transfer business and the loading operation was continued until 6:00 p. m. at which time 801 tons of steel had been loaded into twelve of the thirteen cars on the float. One of the cars located on the portside of the stern end of the float was empty, and the one alongside of it was only partly filled. Libelant's Marine Supervisor and Assistant Marine Superintendent, when loading operations ceased, knew the carfloat was down at the bow with a freeboard of less than ten inches with a list to the port; had water in four of its compart-

ments and that it was scheduled to be towed to Oak Point sometime during the night.

4. Libelant's Marine Supervisor and Assistant Marine Superintendent went home for the day at 6:00 p. m. leaving instructions that the carfloat was to be towed stern end first. During the course of the evening the carfloat's bow continued to settle and this fact was reported to libelant's office.

5. Sometime after 11:00 o'clock a floatman (from libelant's tug Transfer 11 which had been dispatched to move the float) discovered that the forward end of the float was under water which was pouring through the ventilators into the No. 3 compartment. The tug did not attempt to move the float in this condition. At about 12:30 a. m. on February 10th the gondola cars on the starboard side of the float broke their chains and rolled forward off the float into the river and five cars on the portside fell off the side of the float by reason of the backlash. According to stipulation the damage to the cargo and railroad cars amounted to $42,438.85. An examination of the float after the accident revealed a small hole in the port bow corner and a number of loose rivets in the lower bow angle.

## Conclusions of Law

I. Libel is dismissed.

It is our view that this case is determined by the fact that the losses incurred were not caused by "Perils of the Sea". On the facts in this case it is the Court's opinion that the immediate cause, and the only cause of the accident, was libelant's gross negligence. On February 9th, as early as 3:00 p. m., libelant's managing agents had full knowledge of a situation which merely had to continue to exist in order to result in the accident which eventually did occur and could have been worse. Libelant's Marine Supervisor and Assistant Marine Superintendent with full knowledge of the facts, and in the face of a series of warnings, apparently in the interests of speed, deliberately continued to load a listing carfloat with a heavy cargo of steel. The only order which we believe they gave in the interest of safety was that the carfloat was to be towed stern first.

The libelant in this case went to great pains to show that a certain amount of leakage in a vessel of the Carfloat No. 60 type was usual and to be expected. There is not a scintilla of evidence that anything happened other than this leakage from the time the loading of the steel ceased and the time when the vessel lost its cargo, which could properly be described as a "Peril of the Sea". Libelant, by 6:00 p. m., through the gross negligence of its managing employees had rendered the Carfloat No. 60 unseaworthy and had placed the railroad cars and the goods insured by respondents in such a perilous position that loss was inevitable in the absence of remedial action. Libelant's failure to take any action in the face of repeated warnings from 6:00 p. m. to 12:30 a. m. was a continuation of the same type of negligent conduct which created the situation.

Although it is the tendency of the courts to construe insurance policies strictly against the insurer, Henjes v. Aetna Ins. Co., 2 Cir., 132 F.2d 715, the insured cannot, by their own wilful misconduct, enlarge the insurers' risk to include the ordinary and inevitable action of the sea with respect to an unseaworthy vessel. Union Insurance Co. v. Smith, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; Western Assurance Co. of Toronto, Canada v. Shaw, 3 Cir., 1926, 11 F.2d 495.