**GULFSTREAM CARGO, LTD.,**
Appellant,

v.

**RELIANCE INSURANCE COMPANY,**
Appellee.

No. 23109.

United States Court of Appeals
Fifth Circuit.

March 28, 1969.

Paul E. Gifford, Miami, Fla., Dubbin, Schiff, Berkman & Dubbin, Miami, Fla., of counsel, for appellant.

G. Morton Good, Cromwell A. Anderson, Miami, Fla., Smathers & Thompson, Miami, Fla., of counsel, for appellee.

Before JOHN R. BROWN, Chief Judge, TUTTLE and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The question in this case is whether nondisclosure by the prospective assured of known facts reflecting spectacular unseaworthiness of the vessel existing at the time the policy attaches constitutes concealment vitiating the AITH (Hulls) time policy. The District Judge, long

experienced in maritime matters, on fact findings [1] that are not challenged, concluded that there was concealment and its consequence was the avoidance of the policy. From this it inevitably followed that he held the Insurer [2] not liable for the total loss of the vessel ten months later from a peril otherwise covered under the Inchmaree clause,[3] for negligence of the master in imprudently abandoning ship after development of leaks not shown to have been causally related to the earlier unseaworthiness. We affirm.

In October 1961, the Assured [4] sought insurance on the M/V Papoose, a wooden-hull vessel then "coming to the twilight of her life." [5] Built in 1933 to a length of 69 feet, she was rebuilt in 1936 by lengthening her to 73 feet. In terms somewhat inelegant and certainly lacking in nautical flavor, it was this tail end which is Assured's undoing.

At the time of her purchase by the Assured in October 1960, a detailed condition survey report was made by marine surveyor Havenner. It showed M/V Papoose to be generally in good shape.[6] Whether she was so in fact is now open to serious question as the Assured's action as owner attests.[7]

The policy was issued to take effect on October 12, 1961. The Assured dealt with its agent Thomas Burckes of Wash-

---

1. The findings of fact and conclusions of law are reported at 1966 A.M.C. 385.

2. Reliance Insurance Company.

3. The Sea Pak, Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 122–123, n. 12, 1957 A.M.C. 1946; M/V Spot Pack, Saskatchewan Govt. Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 391, 1957 A.M.C. 655.

4. Gulfstream Cargo, Ltd., a corporation, wholly owned by Mr. Wilken, a landscaper, and his wife, a commercial artist. These occupations, so far removed from seafaring activities, may serve to lessen any suggestion of purposeful, conscious concealment. Most of the time use of the term is a shorthand reference to one or both of the Wilkens. The corporation never acted or spoke through any others.

5. In addition to this characterization, M/V Papoose, as the facts will soon reflect, almost literally qualified for Judge J. Skelly Wright's other colorful language about that Greek vessel, "She was rusty, she was leaky, she was hogged." United Distillers of America v. The T/S Ionian Pioneer, E.D.La., 130 F.Supp. 647, 1955 A.M.C. 1338, aff'd, 5 Cir., 1956, Ionion S. S. Co. of Athens v. United Distillers of America, 236 F.2d 78, 81, 1956 A.M.C. 1750.

6. The report was on a 3-page printed form with blanks filled in as to some 113 items (plus sub-items in the same line) under principal categories of General, Hull, Spars & Rigging, Fittings and Equipment, Galley, Machinery, Electrical System, Trial Run Data, Fire Fighting Equipment, Remarks and Recommenda-

tions. The form concluded with the printed statement:

"The above vessel at this inspection is not deemed to be a good fire and marine risk in its present status *unless* the following recommendations are complied with." (Emphasis in original.)

Under the heading "Recommendations" there was typed in the following conclusion:

"All recommendations made to owner * * * and buyer * * *. Recommendations minor and are being complied with."

Opposite Havenner's signature was that enigma wrapped in a mystery which is as much a part of the legendary folklore of the sea as a fid or marlin spike, the ubiquitous, ambiguous, amphibious, if not meaningless "without prejudice".

7. At the time of the trial before Judge Dyer there was pending in Maryland a suit by the Wilkens against the seller and surveyor Havenner for fraudulent misrepresentation as to the condition of M/V Papoose at the time of the 1960 survey and purchase. There is some indication that perhaps the case was tried, but we are not informed as to the outcome—although it has great significance as time will shortly tell. See notes 13 and 22 and related text. Although the Wilkens do not acknowledge any such purpose, Insurer's representatives testified about insurance agent Burckes's remarks indicating plainly that he was apprehensive the Wilkens were about to sue him also, for failure to take all prudent steps to assure that the insurance procured would be valid and effective to cover the total loss of M/V Papoose.

ington, D. C., whose familiarity with wet marine insurance was presumably limited. He in turn dealt with Mr. Tierney of Thomas J. Fisher & Co., Washington agents of Insurer, who in turn dealt with Insurer's Baltimore office (William Becker and his assistant Charles Hall), who in turn dealt with the Philadelphia home office (McTott, in effect, manager of the marine department).

In response to a request of Insurer's Baltimore office, Tierney obtained and transmitted a copy of the Havenner survey report (note 6, supra), which he obtained from Burckes who in turn got it from Mrs. Wilken. In his transmittal letter Tierney added the comment that "I understand the ship is in better condition than when the [Havenner] survey * * * was made. * * *" 8 [R. 115]. Thus the picture painted was the rosy one of a fine craft then in tip-top shape.

But this was far from the truth as the Assured knew only too well. This knowledge went back at least to the preceding June (1961) when the vessel's Master reported that on the trip from Maryland to Fort Lauderdale, Florida, the stern of M/V Papoose had unusual rhythmic vibrations and that she leaked excessively. But it didn't end there, nor did it end with imputed knowledge from reports made to the owner by the Master. For after an interlude in a shipyard,

M/V Papoose with the Wilkens aboard set out on a voyage to and from Fort Lauderdale and Nassau in the Bahamas. On that trip the vessel again leaked excessively. On return to Fort Lauderdale, the vessel was again put into shipyard at Broward Marine.

The shipyard was alarmed at the sag in her stern, so much so that they feared she would hog or break while on the ways. They recommended that a surveyor be employed to advise the owners concerning handling her on the dry dock and the repairs needed. At this point, now about September 15, 1961, enters Chadwick, a marine surveyor of unquestioned competence, his recommendations for repairs,9 and his report to the owners. With a simplicity of understatement the Trial Judge characterized this two-page report as revealing "extensive repair work necessary in the stern of the vessel due to rot." But it was more than that. In the very opening paragraph of his report, Chadwick takes note of the Havenner survey, a copy of which he was furnished, and points out the deficiencies of that survey and the probable cause of them.10 And then in detail his report reveals starkly the things which made M/V Papoose unfit "for any use offshore" or for "carrying cargo even on the Intercoastal Waterway.11

8. The matter of repairs came up because the application showed a cost of $18,000, while insurance desired was $20,000. To Insurer's inquiry, Burckes said that Assured had spent "over $2,000" on repairs.

9. Bearing the same date, September 15, although apparently manually delivered a day or two earlier, was a detailed list of repairs recommended by Chadwick. The repair list began:
"The repairs are considered necessary as a result of extended dry rot and deterioration in the chines, planking, and structural members of the after section of the vessel and sagging from improper spacing of scarphs in extended horn timber cheek pieces."

10. Of the Havenner survey report, he stated:

"We * * * are aware of the hidden and inaccessible areas where deterioration can occur and can only be revealed by extensive removals and/or borings. * * * We note that the vessel was surveyed afloat. The seaworthiness and true condition cannot be ascertained afloat."

11. "At the time the undersigned was engaged, the owners of the vessel and the captain were concerned with her safety. By examination, and the conditions found, we could not recommend the vessel for any use offshore, and could not recommend her for carrying cargo, even on the Intracoastal Waterway. Structural members and planking of the after section were deteriorated to such an extent that any grounding or subsequent bending of propeller or propeller shaft, and resultant vibration would cause the vessel to open

But this report, except for putting it in more technical and specific terms, did not really teach the Wilkens anything they did not know. They were fully aware of the facts the report revealed and of the vessel's condition.[12] And as proof positive that they were aware that the Havenner survey report—within a few days

excessively and result in leaking, which would be beyond the capacity of the bilge pumps. This deterioration of structural members has occurred over a long period of time and many areas must have been apparent for the past several years visibly without any borings necessary.

"When the vessel was first dry-docked, the after section from the rake ends aft drooped and sagged so much that the shipyard did not continue the dry docking for fear of the stern opening up. After preliminary examination, the vessel was re-dry-docked and side tracked after being targetted and was jacked and shored into a water-borne position. * * * [Reference to identified photographs]. The extent of the sagging condition of the horn timber can be seen in the photographs ' * * * showing the open and split section in the knee on the after side of the stern post. Also in this photograph can be seen the excessive deterioration of the horn timber, stern post, and knee. Cheek pieces had been installed on each side of the horn timber to extend the horn timber. However, joints were not adequately staggered, and fastenings were in deteriorated wood and had no holding power.

\* \* \* \* \* \*

"The sagging of the vessel's sides is not from dry docking but from lack of proper scarphing and reinforcing at the rake ends. * * *

"The after section of the vessel [shown in photograph] has no vertical framing between chine log and sheer clamp. Vertical strength is maintained by the vertical planking and its fastening to the sheer clamp and chine log. In nearly every instance, the vertical planking is deteriorated either at the chine log or sheer clamp, therefore the vessel has no vertical strength in this area.

"The attached recommendations are considered to be a minimum to make the vessel seaworthy and we recommend, due to fuel capacity, age, condition of the hull and equipment after repairs are made, its navigational limits be inland, coastwise and Bahamas."

12. The following is from Mr. Wilken's deposition. About the trip to Nassau, he acknowledged considerable leaking:

"Q. Where was the water coming from?

"A. It was coming through—The boat had at one time been changed, the rear end, and about four feet had been added to the stern of the vessel. And where they added to the original hull, there was a seam there and it was coming in through the seam at that point where the new stern had been attached to the old frame of the vessel.

"Q. The stern was pretty rotted, wasn't it?

"A. Yes, sir.

"Q. And when did not discover this condition?

"A. When we put it up in Broward Marine after we came back from Nassau."

[R. 314].

Of the Chadwick survey report, he testified:

"Q. You then were aware * * * of Mr. Chadwick's comments concerning the vessel Papoose shortly after the date of that letter of September 15th?

"A. We were aware. * * *

"Q. Did you read [the Chadwick survey report]?

"A. Yes, sir.

"Q. You also read these recommended repairs which are also dated September 15th * * * ?

"Q. Right.

[R. 320–21].

Mrs. Wilken's knowledge is even more significant since she was having all dealings with Burckes about the insurance. After acknowledging the extensive leaking while in Nassau and on return trip and putting M/V Papoose into Broward Marine, she testified:

"Q. What was the condition of the vessel when they hauled her out of the water?

"A. Bad. It was bad enough so that they had to call us and tell us that they would not take it out until they— They tried to haul it out, but the back end, the seams seemed to be splitting, so that they had to build a special cradle for it.

"Q. Isn't it a fact that when it was hauled out on the ways the stern of that vessel was in such bad condition that it dropped and they were afraid it was going to break off entirely?

"A. Yes.

"Q. And they had to prop the stern up?

"A. Yes, sir."

[R. 349–50].

known by them to be in the hands of Insurer considering issuing hull coverage on M/V Papoose—did not reflect the true condition of the vessel at that time, and for that matter probably in 1960 at the time of purchase, the Wilkens fired off two hot letters on September 7 and September 25, 1961, to the sellers in Maryland complaining vociferously of misrepresentation by the seller.[13] That this was no off-the-cuff, spur-of-the-moment, impetuous complaint made in the passion of anger is shown by the fact that these claims soon resulted in lawsuits against both the seller and surveyor Havenner (see note 7, supra). Devastating as was this information, now known both by personal experience, observation, and from the detailed Chadwick survey, the Chadwick survey was not sent to Insurer nor, for that matter, even to Burckes. Nor is there any testimony from either of the Wilkens that either of them relayed all or part of the Chadwick survey report by word of mouth to Burckes. Although Burckes claims to have passed on information to Tierney, and we credit that fully as the trial Judge did *arguendo*, nothing approaches the specificity or spectacular nature of the deficiencies or, more significant, Chadwick's informed categorical expert opinion of basic unfitness, that is unseaworthiness, for the proposed trade—a factor of the first magnitude to a marine underwriter.[14]

13. By use of testimony in the Maryland suit, no substantial question exists about the dates of September 7 and September 25, 1961. Of one of the letters, Mrs. Wilken said that "I know it was a scorcher," [R. 350] and that the letters "told [the seller] about the bad condition of the vessel." [R. 353].

14. In addition to furnishing Tierney a copy of the Havenner survey report, Burckes testified about the current repairs being made estimated to run $1800 to $2000:

"Q. Do you recall what information you furnished them?

"A. I told Mr. Tierney that the boat was in dry dock having repairs done on it * * *.

"Q. Did you tell him the nature of these repairs?

"A. To the best of my knowledge, I recall stating the repairs were to the planking and to the transom, if I recall.

"Q. Did you tell him why these repairs were necessary * * *?

[Objections]

"A. * * * I told Mr. Tierney I thought the repairs were necessary because the boat had some planking that had to be replaced and the transom was in need of repair and replacement.

* * *

"Q. Do you recall whether you furnished [Tierney] specifically a marine survey of M. L. Chadwick?

"A. I did not.

"Q. Were you aware of that document of Mr. Chadwick?

"A. I was not.

"Q. Had the Wilkens contacted you at that point and informed you of the repairs to be done on the vessel?

"A. They had called me, told me the boat was in dry dock undergoing repairs to the planking and the transom and *that was all that I knew of it.*" (Emphasis added.)

[R. 234–35].

Acknowledging that on his deposition he was seeing the Chadwick report for the first time, Burckes stated he was advised of a report, but to the question "To what extent were you advised?", his reply was this general one: "They told me that the boat needed repair work and that they had taken it into the [shipyard] to have that repair work done." [R. 238] Pressed whether either of the Wilkens advised him of the categorical recommendation against "any use offshore" or "for carrying cargo even on the Intracoastal Waterway" (see note 11, supra) he was asked:

"Q. Were you ever advised in essence of that?"

To this he replied:

"A. That wasn't quoted to me by way of telephone. Mrs. Wilken did tell me that the surveyor, that he had looked at the boat when it was down in Florida, had told her the boat was not in good condition and work had to be done on it. Since, she put it on the dry docks to have the work done. *That is as far as I know,* the additional repair work that was done down there." [R. 239] (emphasis added).

Except to acknowledge receipt of information from the Wilkens that estimated repairs would run in the neighborhood of $2000, he showed how little

With this approach, little detail is needed concerning how Insurer's witnesses Tierney, Becker, and Hall described the information received by each of them from Burckes. First, being a factual matter resting almost altogether on recollections of informal telephone and oral communication, the Judge's fact findings have the heavy insulation of F.R.Civ.P. 52(a). Second, these representatives could hardly learn more than they were told, and Burckes makes clear that he learned little and told them no more (see note 14, supra). But on any analysis, the Trial Judge was certainly entitled to find that they were neither informed of the extensive nature of the patent deterioration or of the spectacular nature of the vessel's unfitness, nor did they learn enough to put them on inquiry.[15]

he had been told and, consequently, how little he could pass on to Tierney:

"Q. Then as I understand it, you did not advise Mr. Tierney, nor for that matter did you know of the specific nature of the Chadwick survey, you only knew that certain wood replacements were being made for deterioration and that was the information you relayed?

"A. That is right.

"Q. Nothing in detail concerning the extensiveness of the repairs, or the removals and replacements?

"A. Nothing in detail."

[R. 241].

15. The following testimony is from Tierney's deposition:

"Q. Other than the information in regard to the captain and the marine survey from Havenner, was any further information given to Mr. Hall by you concerning the condition of this boat or anything of that nature?

"A. The only other information was the fact that there was some work to be done on the vessel.

[R. 63].

"Q. Have you ever, and specifically were you ever informed by Mr. Burckes of the contents of that [Chadwick] survey?

"A. Not this, no."

*       *       *       *       *       *

"Q. You understood it was in dry dock for $1800 or $2000 repairs?

"A. Yes, that is right."

"Q. Did anyone request a current survey be made of the vessel, that is, a survey as of October 1961?

"A. I think Mr. Hall mentioned it. But he said he would accept this [Havenner] one."

[R. 66–67].

Tierney talked to Hall several times.

"Q. Did you inform him at least in one of those telephone calls that a lot of work was being done on the Papoose?

"A. No, I don't think I ever said there was a lot of work. I did say there was work to be done on the vessel."

*       *       *       *       *       *

"Q. Did you then as a general nature make an inquiry as to the general nature of these repairs?

"A. Yes, it was verbal wording to the effect that there was some planking that had to be repaired, a little work on the engines, basically minor work.

"Q. Was the reason for this repair of the planking told you?

"A. Yes.

"Q. What reason was given?

"A. It was rot, but not extensive in any shape or form. Of course, a vessel this size, that much work is not extensive work on a yacht of this size.

[R. 72–73]

"Q. When this figure of $2000 was mentioned to you, did you make inquiry as to whether this was maintenance or repairs to the vessel?

"A. It was repairs that I checked. It was repairs.

*       *       *       *       *       *

"Q. Did any employee of [Insurer] at any time ask you to determine the nature of those repairs?

"A. They basically wanted to know what they were.

"Q. Did you make inquiry as to what these were?

"A. Yes.

"Q. You were told then that this was because of rot in some of the planks?

"A. That is correct, the majority of it. There was as I recall it some repairs to the engines. Other than that, that is about all I recall."

[R. 76–77].

"Q. Did you advise [Insurer] that this $2,000.00 repairs supposedly would make the vessel in better condition than reflected in the Havenner survey?

"A. That is right.

"Q. From whom did you get that information?

"A. Mr. Burckes."

[R. 86].

Nothing is added by the Judge's crediting *arguendo* Burckes's testimony that he requested a survey be made by Insurer. See 1966 A.M.C. at 389.

It rounds out the factual review to say that the testimony was uncontradicted that had Insurer been furnished the Chadwick report either by a copy or a substantial oral summary of it, the insurance would not have been effected, and indeed the submission would not have even been considered. Of course, testimony of this kind coming long after the issuance of the policy and the intervening loss, not shown to have been causally related to the earlier concealed unseaworthiness, is self-serving in a vivid way. But this goes to its credibility, and the Trial Judge impliedly credited this. Considering the fact that an honest, reasonably complete report of Chadwick's findings would have alerted the prospective underwriter to the judgment of a qualified expert concerning the present spectacular and marked unseaworthiness, it is an understatement to say the Trial Judge's fact findings on this point remain safely afloat with the buoyancy that F.R.Civ.P. 52(a) affords. See June T, Inc. v. King, 5 Cir., 1961, 290 F. 2d 404, 1961 A.M.C. 1431.

When we come to the law it is direct and clear. And this is so whether the case is governed by the maritime law or whether, under *Wilburn*,[16] it becomes a question of Florida law. The law of Florida recognizes concealment as a ground for avoiding the contract altogether,[17] and there is every indication that if Florida's preceding law is inadequate to fill in all the gaps, Florida would draw heavily on maritime law in fashioning its own principles.[18]

In the last *Wilburn* decision, note 16 supra, this Court declared the law in unmistakable terms:

"Nothing is better established in the law of marine insurance than that 'a mistake or commission material to a marine risk, whether it be wilful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy. And the same rule obtains, even though the insured did not suppose the fact to be material.' 3 Couch Insurance, at page 2568. And it is stated in 29 American Jurisprudence, Insurance, at page 956: '§ 690. —In Case of Marine Insurance.—'Concealment,' in the law of marine insurance, is the failure to disclose any material fact or circumstance in relation to the subject matter of the contract which may increase the liability to loss, or affect the risk or obligation assumed, and which is, in fact or law, within or ought to be within, the knowledge of one party, and of which the other party has no actual or presumptive knowledge. In the case of marine insurance the insured must disclose all facts material to the risk, and in default of such duty the contract may be avoided by the insurer. In other words, an applicant for marine insurance must state all material facts which are known to him and unknown to the insurer. It has been said that the insured is bound to communicate every material fact within his knowledge not known or presumed to be known to the underwriter, whether in-

16. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. The *Wilburn* case has had a rich history in this Court, see Wilburn Boat Co. v. Fireman's Fund Ins. Co., 5 Cir., 1953, 201 F.2d 833, reversed, 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, on remand, 5 Cir., 1958, 259 F.2d 662, cert. denied, 1959, 359 U.S. 925, 79 S.Ct. 607, 3 L.Ed.2d 628, and concluding with 5 Cir., 1962, 300 F.2d 631, 1962 A.M.C. 1593, cert. denied, 1962, 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505.

17. See Columbian Nat'l Life Ins. Co. v. Lanigan, 1944, 154 Fla. 760, 19 So.2d

67; cf. Casey v. Welch, Fla.S.Ct., 1951, 50 So.2d 124; Biscayne Blvd. Properties, Inc. v. Graham, Fla.S.Ct. 1953, 65 So.2d 858. See generally 18 Fla.Jur., Insurance § 455; 14 Fla.Jur., Fraud and Deceit § 88.

18. As an analogy, see the incorporation of maritime principles into State death survival statutes. M/V "Tungus" v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 523, 3 L.Ed.2d 524, 1959 A.M.C. 813; and Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 1960, 276 F.2d 42, 47 n. 6, 1961 A.M.C. 1469.

quired for or not; and that a failure in either particular, although it may arise from mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void, for the reason that the risk assumed is not the one intended to be assumed by the parties." 300 F.2d at 646.

With much ground for echoing the Court's conclusion there expressed, that the maritime law, not the state law, would control on the issue of conceal-

ment,[19] see 300 F.2d at 647 n. 12, we again find it unnecessary to resolve the point further. Of Florida we can say what we there said of Texas. "Although we have found no Texas case expressly applying this rule, there is no indication that the Texas courts have departed from this firmly established principle of marine insurance." 300 F.2d at 647.

All the precedents agree with the general rule as stated above.[20]

The Assured does not really challenge these principles. Rather, while accept-

---

19. At 300 F.2d 633 and again at p. 647, n. 12 speaking in terms of state law controlling "at least 'where entrenched federal precedent is lacking' ", we cited *Kossick*. Justice Harlan's comments are persuasive. "Nor is Wilburn Boat Co. v. Fireman's Fund Insurance Co. * * * apposite. The application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented." Kossick v. United Fruit Co., 1961, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed. 2d 56, 64, 1961 A.M.C. 833.

20. See, e. g., 45 C.J.S. Insurance § 645a:
"Contracts of marine insurance are uberrimae fidei and there is an obligation voluntarily to disclose all facts and circumstances which are material to the risk and not within the knowledge of both parties. * * * It is immaterial that information received by insured is in fact untrue, and the policy is avoided if he, without knowledge of its untruth, failed to disclose it. Where the insurance is effected through an agent or broker, insured must exercise diligence to inform such agent or broker of the facts of which he is possessed.

"In marine insurance, contrary to the general rule applicable to other kinds of insurance discussed supra § 473(3), any omission to communicate a material fact which insured is under an obligation to disclose will vitiate the policy whether such omission is intentional or results from mistake, accident, forgetfulness, or inadvertence; and fraud is not necessary."
The stringent requirements enveloped in the Latin phrase *uberrimae fidei* are reflected by the classic definition:
"The most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment or deception, however slight.

A phrase used to express the perfect good faith, concealing nothing, with which a contract must be made; * *. Black's Law Dictionary 1690 (4th ed. 1951).
See also 2 Arnould, Marine Insurance & Average § 575, at 531 (13th ed. 1950):
"The contract is one *uberrimae fidei*, and on the plainest principles of equity such a contract which one party has thus been induced to enter upon from his ignorance of the thing concealed shall not be enforced against him by the other who has concealed it. Whether such suppression of the truth arises from fraud (that is, from a wilful intention to deceive for the party's own benefit), or merely from mistake, negligence, or accident, the consequences will be the same."
This is codified in the British Marine Insurance Act § 18 (1906). See 2 Arnould, *supra* at 532.
"All facts are material which would affect the mind of a rational underwriter, governing himself by the principles on which underwriters in practice act, as to either of the following points: 1st, whether he will take the risk at all; 2nd, at what premium will he take it." *Id.* § 589, at 545 (footnotes omitted).
"The duty attaches at the time of effecting the insurance, * * * for the effect of a concealment in avoiding the policy is to be determined not by its eventual relation to the nature of the risk, but with reference to its immediate influence on the judgment of the underwriter." *Id.* § 590, at 548 (footnotes omitted).
Materiality certainly goes to "the state of the ship." *Id.* § 600, at 557.
See F. Tempelman & C. Greenacre, Marine Insurance 16–17 (4th ed. 1934); W. Winter, Marine Insurance 223 (3d ed. 1952).

ing them it insists that the same authorities recognize that the underwriter's absolute right to demand disclosure of material facts may be waived by the neglect of the underwriter to make inquiries concerning facts where a basis for inquiry is raised by the information communicated and where the facts disclosed are such as are calculated to put any reasonable and prudent underwriter on inquiry.[21]

■ But as our detailed discussion of the facts earlier pointed out, Burckes was never given the critical information by Mrs. Wilken that an acknowledged expert considered the vessel wholly unfit and in need of major repairs to make her reasonably fit. What he did not know from information supplied by Assured he could not pass on to Tierney, nor could Tierney pass it on to Hall or Becker. All Insurer learned in this Tinkers-to-Evers-to-Chance exchange was that M/V Papoose was in need of $1800–$2000 repairs to a transom and planking as a result of some rotted timbers. There was nothing in this mild disclosure to put them on further inquiry concerning the extent and nature of the things which then made the vessel completely unfit not only in the judgment of the surveyor but of Assured as well.[22] The Trial Judge had ample basis for concluding in effect that this did not constitute a waiver of the underwriter's absolute right to demand full, open, honest, complete, accurate disclosure of facts then well known which bore directly upon the condition of the vessel.

Nor under the facts of this case as found by the Trial Court can Assured get any comfort from the principle sometimes applicable that facts within the boundaries of a warranty, either expressed or implied, need not be disclosed since the breach of the warranty will afford a good defense.[23]

There are a number of reasons. In the first place, there actually was inquiry on behalf of Insurer. At the time of Burckes's first submission, Tierney, at the request of Hall, asked for a survey report and the Havenner survey was supplied. There was thus a precise request for a statement from an expert marine surveyor concerning in detail the general state of the vessel. Submitting the Havenner report was only half of the story. Indeed, to the knowledge of the Assured it soon become no story at all—except, perhaps, an untrue "story" in a childish sense. A request for a survey report having been made, this rule now urged would not tolerate, much less approve, Assured's failure to come forward with fair and full information once the facts reflected in the Chadwick report and also then known personally to the Wilkens came to light. More than that, the rule contemplates that at the time of the attachment of the policy, the vessel will comply with the implied warranty of seaworthiness. Here at the moment the Chadwick report was received the ship was unfit for anything. Ironically it was even unfit for dry docking. And the extensive leaks in Nassau and on the return trip demonstrated she was then unfit to float in any water, in any service. Worse, this was her condition not only on October 12 when the insurance attached. It continued for an undetermined number of months as M/V Papoose remained in the shipyard until about July, 1962. Just when, if ever, M/V Papoose became fit is not shown.[24] And, of

---

21. The assured cites 9 Couch, Insurance § 38:81 (2d ed.) ; 2 Arnould, Marine Insurance 576 (14th ed.) ; and several English cases, e. g., Cohen v. Standard Marine Ins. Co., 1925, 30 Com.Cas. 139, 10 British Shipping Laws (discussed in 2 Arnould's 13th ed. at p. 572) ; Asfar & Co. v. Blundell, 1896, 1 Q.B. 123. Neither case compels a different result here.

22. See notes 7 and 13, supra.

23. The assured cites 45 C.J.S. Insurance § 646 ; 2 Arnould, Marine Insurance 59 (15th ed.) ; 9 Couch, Insurance § 38:108, at 410 (2d ed.).

24. Chadwick acknowledged that if all repairs recommended by him were done, the vessel would be fit so far as those conditions were concerned. When that was done is not shown.

course, it was on her very first voyage in August after these extensive repairs [25] that leaks shortly developed in the stuffing box bringing about her total loss.

■■ More important, that rule rather than helping, compels an equally adverse conclusion. For under the American Rule, unlike the English, there is an implied warranty of seaworthiness in a time policy.[26] A consequence of this is that if the vessel is unseaworthy—as M/V Papoose assuredly was [27]—at the time the insurance attaches, the breach absolutely avoids the policy.[28] Existing, spectacular unseaworthiness kept the policy from becoming effective.[29]

The Judge was right on all scores: the facts, the law, whether Florida, maritime or an amphibious mixture of both. There it ends.

Affirmed.

25. All of the emphasis in Burckes's communication to Tierney and by Tierney to Hall-Becker were in terms of repairs in the neighborhood of $1800–$2000. Assured freely acknowledged that the cost of making the repairs required by Chadwick far exceed that figure, aggregating some testified about $5000.

26. As to the distinction between the English and the American rule on the presence or absence of a warranty of seaworthiness in a time policy, see the M/V Spot Pack, Saskatchewan Gov't. Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 388, 1957 A.M.C. 655. Under the American rule, a warranty of seaworthiness is implied as of the very moment of attachment of the insurance. Under the American rule once the warranty is satisfied (as it clearly was not here) the warranty thereafter becomes a modified "negative" one in which it is warranted that the owner, from bad faith or neglect will not knowingly permit the vessel to break ground in an unseaworthy condition.

27. Although not precisely stated affirmatively the Judge's findings of fact (see, e. g., No. 8), 1966 A.M.C. at 386 [R. 270] and conclusions of law (e. g., "—concealing a survey report which shows the vessel is unseaworthy at the time of the application—"), 1966 A.M.C. at 389 [R.

277] all add up to patent unseaworthiness as a matter of law. See Walker v. Harris, 5 Cir., 1964, 335 F.2d 185, 1964 A.M.C. 1759, cert. denied, 1964, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342.

28. See 45 C.J.S Insurance § 650, at 555 "If there is any breach of a warranty the policy is null and void, and * * * the underwriters are relieved of their liability notwithstanding the loss is not connected with the breach or the breach is cured prior to the loss." See also Levine v. Aetna Ins. Co., 2 Cir., 1943, 139 F.2d 217; Fidelity-Phenix Ins. Co. v. Chicago Title & Trust Co., 7 Cir., 1926, 12 F.2d 573.

Of course, if the warranty is complied with at attachment, then the policy is effective and subsequent breaches merely suspend coverage until the breach is cured and the consequences of the breach are obliterated. Henjes v. Aetna Ins. Co., 2 Cir., 1943, 132 F.2d 715, 1943 A.M.C. 27, cert. denied, 1943, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711.

29. Under the pretrial stipulation-order this was clearly within the issues of (a) fact: "(c) was the M/V Papoose seaworthy at all material times?" and of law: "(b) Has [Assured] breached its warranty of seaworthiness?" Cf. Laird v. Air Carrier Engine Service, Inc., 5 Cir., 1959, 263 F.2d 948.