RANGER INSURANCE COMPANY, Appellant v. MACY, Respondent v. KLUTHE & LANE & ASSOCIATES, Respondent

(227 N.W.2d 426)
(File Nos. 11452, 11487. Opinion filed March 26, 1975)

Charles H. Whiting of Whiting & Freiberg, Rapid City, for plaintiff and appellant.

James W. Olson of Wilson, Gundersen & Olson, Rapid City, for defendant and third-party plaintiff and respondent.

Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for third-party defendant and respondent.

DOYLE, Justice.

The plaintiff, Ranger Insurance Company, issued a policy on defendant Macy's airplane. After the insured airplane was damaged in an accident a lien on the plane of $12,000 held by a party not involved here was foreclosed. Ranger paid the lienholder $12,000 and took title to the plane according to the terms of a Breach of Warranty Endorsement attached to the

insurance policy. [1] Macy then purchased the airplane from Ranger for $4,680.60, its salvage value.

Ranger brought this action against Macy alleging there was no coverage on the plane at the time of the accident because Macy was leasing the plane to another pilot. Ranger's policy on the plane excluded all damage incurred while the plane was subject to lease. [2] Ranger's complaint sought damages of $7,319.40 — the difference between the $12,000 paid by Ranger on the Breach of Warranty Endorsement and the $4,680.60 received from Macy on the sale of the damaged aircraft.

Macy answered denying the existence of any lease and counterclaimed for the remaining amount due him under the coverage provisions of the policy which provided amounts up to $15,500. The trial court found that there was no lease at the time of the accident and ruled in favor of Macy on Ranger's complaint and on Macy's counterclaim awarding damages of $3,500 on the latter. From this judgment Ranger appeals. [3]

1. This endorsement provided in parts pertinent to this discussion: "1. The insurance afforded by this Policy shall not be invalidated as respects the interest of the Lienholder by any act or neglect of the Insured * * * 2. The liability of the Company to any Lienholder under the provisions of Paragraph 1 shall not be the lesser amount of the following: (a) the unpaid balance due on liens pertaining to the aircraft less unearned interest and unpaid installments more than 10 days overdue on the date of loss or damage, if any balance remains after the Lienholder has used all reasonable means to collect amounts due from the Insured * * * 4. Whenever the Company shall pay the Lienholder any sum for loss or damage under this Policy and shall claim that, as to the Insured or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the Lienholder against the Insured or owner and in and to all the property held as security for indebtedness; or the Company may, at its option, pay * * * the whole amount due * * * with interest, and shall thereupon * * * receive a full assignment * * * of all the rights of the said Lienholder against the Insured * * * and of all property held as security for the indebtedness."

2. The pertinent coverage and exclusion provisions of the policy provide: "Coverage G—*All Risks While in Motion.* To pay for direct and accidental loss of or damage to the aircraft * * * occurring while the aircraft is in motion under its own power or the momentum generated therefrom, or while the aircraft engine is operating * * * . *This Policy does not apply:* * * * 8. Under Coverages F and G: * * * (f) while the aircraft is subject to * * * lease, conditional sale * * * or other encumbrance not specifically stated in the Declarations."

3. This case also involves a third-party complaint by Macy against the insurance agent for Ranger and a cross-complaint by the agent against Rang-

We believe that the issue of whether the plane was subject to lease at the time of the accident is dispositive and, viewing the evidence in the light most favorable to the verdict, we affirm the judgment of the trial court. The record shows that Macy, a resident of Rapid City, and Antique Auto House, Inc., of Loveland, Colorado, entered into a lease-option agreement on May 27, 1969. Antique Auto House, Inc., was represented by its President, Arvin Martensen, who shall be treated as the contracting party in this opinion.

This agreement granted Martensen an option to purchase Macy's airplane on the following pertinent terms:

(1) Martensen was to give Macy a $5,000 good faith deposit;

(2) Martensen was to have the use of the airplane for 30 days or 25 hours of flying time, whichever was shorter, at no cost to him;

(3) Martensen would pay $15 per hour to Macy for every hour over the initial 25;

(4) "* * * the option to purchase * * * shall be renewable at the end of the 30-day period by mutual agreement * * * and any further usage will be paid on the basis of $15.00 per hour until the option is exercised or this agreement terminated as hereinafter provided."

(5) "The parties hereto agree that if the lease is terminated that the Owner agrees to return the initial deposit of $5,000.00 when the Lessee pays for the additional hours of operation on the aircraft * * * and the possession of the aircraft is turned over to the Owner at the Fort Collins-Loveland Airport."

er. When, however, Macy rested without presenting any evidence supporting the third-party complaint, this part of the action was dismissed and none of the issues presented by the third-party complaint and the cross-complaint is before this court.

On June 13, 1969, Ranger issued an endorsement to Macy's policy including Arvin Martensen as an authorized pilot only when accompanied by Macy or a qualified flight instructor. This endorsement was in response to Macy's request for coverage for Martensen. As we shall see, whether Ranger knew of the lease at this time does not affect this case.

The initial 30-day period expired, and the option was extended so that Martensen could arrange financing for the purchase of the airplane. This situation existed until October 20, 1969, when Martensen informed Macy suitable financing was not available, and he had decided not to purchase the airplane. Macy testified that he then told Martensen to park the airplane, not to fly it, and to get a 100-hour inspection performed.

Macy's insurance with Roger came up for renewal, and Macy, still not in possession of his airplane, had Martensen listed again as an authorized pilot. The renewed policy took effect on October 25, 1969, with Martensen listed as an additional pilot. The requirement that Martensen be accompanied by Macy or a qualified instructor was absent in the new policy.

Apparently Martensen flew the airplane after October 20, 1969. Martensen testified that he told Macy this and that Macy's response was there would be no charge to Martensen for those extra hours. Macy, on cross-examination, testified he did not remember ever saying there would be no charge for those extra hours, and that if the airplane had been returned to him with perhaps 40 extra hours on it, he would have charged Martensen for that use of the airplane.

Regardless of this conflicting testimony, however, Macy was unable to pick up the plane at Ft. Collins-Loveland Airport as specified in the original agreement until December 1969. After an exchange of telephone calls, it was decided that Martensen would for various reasons fly the plane to Rapid City on January 1, 1970. Both Martensen and Macy testified it was agreed there would be no charge to Martensen for this specific trip.

Martensen left Ft. Collins-Loveland Airport on January 1, 1970, with his brother, and, instead of flying directly to Rapid City, he decided to make two stops in Wyoming to visit business

acquaintances. During this detour Martensen had difficulty with the plane, decided to attempt a landing on a country road and damaged the plane when it ran into snowdrifts during the emergency landing.

■ The portion of the insurance contract on which Ranger relies is what is commonly known as a warranty. Warranties normally suspend coverage during the existence of a described condition, and recovery will be denied in the absence of a contrary statute whether or not the condition actually contributed to the loss. The insurer normally suspends coverage because the risk of loss is statistically higher on an underwriting basis when the proscribed condition is present.[4]

The language of the policy itself provides that coverage shall not apply "while the aircraft is subject to * * * lease." That is, once the lease is terminated and the statistical increase in risk is eliminated, coverage resumes. Since Martensen was listed as an authorized pilot, coverage should not have been denied if there was no lease at the time of the accident.

■ Ranger stressed in its brief and at oral argument that the plane was still subject to lease even though the written agreement may have been terminated October 20, 1969. We are not prepared to say conclusively that the lease terminated at the same time as the option. The agreement does not so specifically state. Even if, however, Martensen would have remained liable for any use of the plane after October 20, 1969, and even though Macy testified he would have charged Martensen for too many extra hours on the plane's tachometer, the testimony of both Martensen and Macy was that there would be no charge for the flight made January 1, 1970.

SDCL 43-38-10 provides:

"The hiring of a thing terminates:

* * * * * *

(2) By the mutual consent of the parties * * *."

---

4.  Keeton, Insurance Law, Basic Text, pp. 320-23, 369-409 (1971).

The record is uncontradicted that the mutual consent was present before the January 1 flight originated. There is no doubt that the plane was not subject to lease on the day of the accident.

Ranger argues, however, that while coverage would normally resume when the lease terminated it should remain suspended here since the increased risk—Martensen's possession of the plane—still existed. Ranger's reasoning is that Martensen would never have had the plane except for the lease agreement, and that so long as he had the plane, all the factors which increased the statistical risk were still present whether or not the plane was subject to a lease.

This appears to be a logical position, but it is not the law. The cases Ranger cites for authority point this out. One case involved a helicopter that was covered only when piloted by the authorized pilot. The helicopter had dual controls and the pilot let an unauthorized person handle the craft. There was trouble, and the covered pilot took back the controls but not in time to avoid a crash. The court said "the coverage is not reinstated if anything has taken place while the insurance was suspended that would increase the insurer's risk of loss." [5]

Another case involved a tugboat towing more ships than allowed by the policy. A storm came up. The tug had to cut loose from the tow, but it sank anyway. Recovery was denied because "a tug owner [cannot] break the warranty by towing more than one vessel and when trouble comes get his insurance back in force in ample time as a practical matter merely by cutting the line to the forbidden tow." [6]

These cases illustrate the proposition that suspended coverage will not be reinstated by merely eliminating the proscribed condition *after* the statistically greater risk has

5.   Powell Valley Elec. Coop v. United States Aviation U., 1959, W.D.Va., 179 F.Supp. 616, 618.

6.   Henjes v. Aetna Ins. Co., 1943, 2 Cir., 132 F.2d 715, 719.

manifested itself as an actual precarious circumstance. That is not the case here. The proscribed condition, the lease, was terminated *before* any actual harm threatened the plane. We, therefore, hold that the plane was covered by the policy and that Ranger wrongfully denied coverage. Macy was properly awarded the difference between the total coverage in the policy and the amount paid the lienholder.

Macy, however, cross appeals from the trial court's denial of attorney's fees. Macy maintains that Ranger's denial of coverage was "vexatious or without reasonable cause" as provided by SDCL 58-12-3, and Macy should, therefore, be awarded his attorney's fees. [7]

▆▆ Whether the refusal to pay is "vexatious or without reasonable cause" is a question of fact. Wilson v. Allstate Ins. Co., 1971, 85 S.D. 553, 186 N.W.2d 879. We are, therefore, bound by the trial court's decision on this matter unless the record shows that decision to be clearly erroneous. SDCL 15-6-52(a). This record reveals facts in support of the trial court, and we refuse to overturn that decision. Ford v. Hochstetter, 1970, 85 S.D. 4, 176 N.W.2d 501.

The trial court's judgment is, in all respects, affirmed.

All the Justices concur.

---

7. SDCL 58-12-3: "In all actions or proceedings hereafter commenced against any insurance company, including any reciprocal or interinsurance exchange, on any policy or certificate of any type or kind of insurance, if it appears from the evidence that such company or exchange has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, the department of manpower affairs, the trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs, provided, however, that when a tender is made by such insurance company or exchange before the commencement of the action or proceeding in which judgment or an award is rendered and the amount recovered is not in excess of such tender, no such costs shall be allowed."